*In re* G.V., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. L.C., Respondent-Appellant).

Second District    No. 2—96—1096

Opinion filed September 22, 1997.

Bridget W. Hutchen, of Lake Forest, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (Martin P. Moltz and Marshall M. Stevens, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE THOMAS delivered the opinion of the court:

The State filed a second amended petition to terminate the rights of respondent, L.C., to her son, G.V. The petition alleged the following statutory grounds of unfitness: (1) failure to protect the child from conditions within his environment injurious to his welfare (750 ILCS 50/1(D)(g) (West 1994)); and (2) depravity (750 ILCS 50/1(D)(i) (West 1994)). Following a hearing, the court found that the allegations of unfitness had been proved by clear and convincing evidence. The court later found that terminating respondent's parental rights was in G.V.'s best interests. On appeal, respondent argues that the State did not prove her unfit by clear and convincing evidence and

that the trial judge applied the wrong burden of proof at the best interests phase of the proceeding. We affirm.

The termination proceedings followed the death of G.V.'s half brother, F.L. Respondent is the mother of G.V. and F.L. H.V. is G.V.'s father. F.L. died while living with H.V., G.V., and respondent. The cause of two-year-old F.L.'s death was blunt abdominal trauma resulting from child abuse. A jury convicted H.V. of first-degree murder, and he was sentenced to 28 years in the Department of Corrections. Respondent pleaded guilty to aggravated battery of a child and was sentenced to eight years' imprisonment.

On March 9, 1993, the State filed a petition for adjudication of wardship on behalf of G.V. The petition alleged that G.V. was neglected, in that his environment was injurious to his welfare (705 ILCS 405/2—3(1)(b) (West 1992)) (count I), and that he was abused (705 ILCS 405/2—3(2)(ii) (West 1992)) (count II). Respondent stipulated to count I. The court found G.V. neglected and made him a ward of the court. The court appointed the Department of Children and Family Services (DCFS) as his guardian. On February 16, 1995, the court discontinued visitation between respondent and G.V. until further order. The State filed a petition for termination of parental rights and, on December 15, 1995, filed the second amended petition for termination of parental rights.

At the hearing on the State's petition, the State presented the testimony of Sergeant Ralph Henriquez of the Waukegan police department, who testified about the statement he took from respondent on the day F.L. died. In the statement, respondent discussed her living situation during F.L.'s life. Respondent left F.L's father, J.L., because he was abusive to her. She then met and moved in with H.V. Respondent became pregnant with G.V. Respondent believed that H.V. was physically abusing F.L., but claimed she never actually saw H.V. strike F.L. However, another woman with whom they were living told respondent that she had seen H.V. hitting F.L.

Respondent told Henriquez that H.V. abused her. He was jealous because she had previously lived with another man. H.V. sometimes pulled her hair, punched her, knocked her down, and kicked her. He kicked her in the stomach when she was pregnant with G.V. The beatings occurred at least once a week. H.V. did not treat F.L. well because F.L. was not his child. H.V. also told respondent that he did not want F.L.

They later moved into another apartment, at 842 Lincoln in Waukegan. Respondent, H.V., F.L., and G.V. lived there. H.V. continued to beat respondent and did so at least six times after they moved into the new apartment. When respondent would go out, she

would often come home to find bruises on F.L. H.V. would tell her that F.L. had gotten them either by playing or falling down. Respondent believed H.V. was hitting F.L. and when she would confront him with her suspicions he would smirk. The day before F.L.'s death, respondent saw a bruise on F.L.'s stomach, and F.L. told her that H.V. did it. At least two months before F.L.'s death, respondent suspected that H.V. was hurting him. Respondent told H.V. that she did not like him treating her child that way, and H.V. told her that F.L. needed to learn.

On the morning before F.L.'s death, respondent went to the store, leaving F.L. and G.V. with H.V. When she returned, she noticed that F.L. was bleeding from the mouth. F.L. told her that H.V. hit him. Respondent asked H.V. about it, and H.V. said he had been playing with F.L. on the bed and that F.L. had hit himself with a shoe that respondent left on the bed.

Later in the day, F.L. vomited on himself. Respondent bathed him and noticed bruising on his body. F.L. told her that H.V. did it. F.L. got weaker as the day progressed and he did not want to eat. Respondent forced him to eat some porridge, but he threw it up.

The following day, F.L. was still sick. Respondent wanted to take F.L. to the hospital, but H.V. told her they could not do that because there would be an investigation. Respondent continued trying to make F.L. eat, but he kept throwing up. She tried giving him Alka Seltzer to force him to drink and eat, but F.L. kept vomiting and complaining of pain. She heard F.L. cry out that night, and when she went in to look at him, he appeared weaker. She asked, "[W]ho did this to you[?]" and he pointed at H.V. The child was then taken to the hospital by ambulance.

F.L. died at the hospital. Respondent called H.V. to tell him, and he hung up on her. She called him again, and he advised her to say that F.L. had gotten hurt while playing. Respondent told Henriquez that H.V. had caused the injuries. She said that every time she left F.L. with H.V. she came home to find bruises on him. In the two months before F.L.'s death, there were two other occasions on which respondent wanted to take him to the hospital for treatment, but H.V. told her not to.

Respondent told Henriquez that she sometimes used a belt to strike F.L. on the buttocks. She did this when he was rebellious and would not listen. The day before F.L.'s death, respondent had struck him with a belt when he would not take Alka Seltzer or eat. The belt left a mark. Respondent told Henriquez that she had once sought help as a battered woman, but decided to return to H.V.

The parties stipulated that the court could consider the entire

record in respondent's criminal case, that respondent had been incarcerated since September 1993, and that, while incarcerated, respondent completed a parenting class, was enrolled in a domestic violence class, and was a student in adult basic education classes. The court further took judicial notice of H.V.'s and respondent's criminal convictions.

Respondent presented the testimony of Mary Jane Dybas, the DCFS employee who supervised G.V.'s case. Catholic Charities was the direct care provider for G.V.'s case, and Dybas would meet with Catholic Charities to review G.V.'s situation and sign off on any reports made to the court. When Dybas began supervising the case, respondent was not yet incarcerated and the goal was for G.V. to return home. The goal changed to foster care when respondent pleaded guilty to aggravated battery of a child. Respondent was facing eight years in prison and deportation was expected upon her release, and Dybas believed the next best thing was foster placement.

Dybas testified that respondent was cooperative with visitation, but DCFS was concerned with her long-term ability to care for the child and to deal with her history of complex issues. Dybas testified about a social history report that included information about her relationship with G.V. The report showed that respondent's interaction with G.V. was appropriate, that she fed him, changed his diapers, and played with him. She cooperated with Catholic Charities and had weekly visits with G.V. The report further indicated that respondent was involved with Safe Place before being sentenced, went to counseling and parenting classes, cooperated with the service provided, and wanted G.V. to return to her care.

Dybas also testified about a September 1993 case review. The review showed that respondent's attendance at parenting class was marked unsatisfactory because of a lack of documentation. However, her parenting skills at visits were rated as appropriate and satisfactory. She was also rated satisfactory at participating in feeding and changing diapers, demonstrating an ability to provide a safe and nurturing environment, entering counseling, and cooperating and meeting with caseworkers.

Dybas was cross-examined about a social history report on respondent. The report disclosed that respondent had a gang tattoo on her hand and chose to date men who were involved in gangs. The report also disclosed that respondent had once left H.V. because of the abuse and gone to Mexico, but she returned when H.V. begged her to. DCFS was concerned about respondent's choice of abusive mates. Dybas also explained that the goals for respondent changed once she was incarcerated, because she would no longer be able to attend Safe Place or to get domestic violence counseling.

Sister Noreen Murray of Catholic Charities testified that she had been G.V.'s caseworker since November 1993. Murray testified that respondent remained in contact with her after respondent was incarcerated. Respondent called her and also sent cards and letters for G.V. Murray also testified that, while incarcerated, respondent completed three hours of domestic violence education training and received a School District 428 certificate of recognition for excellent attendance for December 1995 and January 1996. Respondent also received a certificate of recognition for completion of the Mother Love parenting program. On cross-examination, she admitted that the certificates were all received for parenting courses after the termination petition was filed.

Respondent also testified. Most of her testimony simply repeated what the State brought out through Henriquez' testimony. However, respondent added that H.V. never abused G.V. and treated him more favorably than F.L. Respondent further testified about parenting classes that she attended. She also attended school and received perfect attendance certificates for February and March 1996.

By stipulation, the guardian *ad litem* presented the coroner's report of F.L.'s death. The report listed 35 points of evidence of external injuries and 5 points of evidence of internal injuries.

H.V. testified that he had seen respondent hit F.L. with a belt and with her hand. He saw bruises on F.L. at least three times. H.V. asked her not to hit him, but respondent said that she had to discipline him. On the day F.L. died, H.V. heard respondent either hitting him or yelling at him and he saw her pulling him by the arm. H.V. also testified that respondent told him that her brother had hit F.L.

On June 28, 1996, the court ruled that the State had proved by clear and convincing evidence both of the allegations of unfitness. On August 23, 1996, the court held a hearing on the best interests of the child. The court heard testimony from Julie Shea (the foster mother and prospective adoptive parent) and from respondent. The court found that it was in the best interests of G.V. that respondent's parental rights be terminated.

■ On appeal, respondent first argues that the State failed to prove by clear and convincing evidence that she was either depraved or that she had failed to protect G.V. from an environment injurious to his welfare. The parental rights of a nonconsenting parent may be terminated only upon an adjudication of unfitness, and a finding of unfitness must be supported by clear and convincing evidence. *In re S.G.*, 216 Ill. App. 3d 668, 669 (1991). Once such a finding has been made, it will be given great deference and will not be disturbed on review unless it is contrary to the manifest weight of the evidence. *In re V.O.*, 284 Ill. App. 3d 686, 690 (1996).

■ After carefully reviewing the record, we find that the State met its burden of proving that respondent was unfit because of her failure to protect the minor from an environment injurious to his welfare. The evidence presented by the State was the same evidence respondent stipulated to in the underlying neglect case. However, the burden of proof is higher under the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 1996)). The State has to prove the parent unfit by clear and convincing evidence. 750 ILCS 50/8(a)(1) (West 1996). We find that the State proved its case by clear and convincing evidence.

Respondent argues that there was no evidence that G.V. was ever abused or harmed by either parent and that the evidence showed that H.V. favored G.V. because he was his biological son. We are not persuaded by this argument. First, there was evidence that H.V. kicked respondent in the stomach when she was pregnant with G.V. Second, evidence supporting a parent's unfitness towards some of his or her children may serve as a basis for the termination of parental rights to all of his or her children. *In re J.R.*, 130 Ill. App. 3d 6, 9 (1985).

The evidence clearly showed that respondent failed to protect F.L. and thus supported the trial court's finding that respondent is unfit to have a child. The evidence showed that respondent knew that H.V. was beating F.L. and she did nothing to stop it. She moved out once but returned to the household and let the abuse continue. Respondent's testimony and her statements to Henriquez showed that she repeatedly came home to find F.L. bruised and she suspected that H.V. was beating him. Any doubt was removed when F.L. himself told her that H.V. had hit him. The day before F.L. died, when respondent knew that he had been beaten and was in pain, she hit him with a belt for not eating or taking medicine. Further, on at least two occasions, respondent failed to seek medical assistance for F.L. because H.V. told her not to. The State proved by clear and convincing evidence that respondent failed to protect F.L. and G.V. from an environment injurious to their welfare, and this evidence supported the trial court's finding that respondent was an unfit parent as to G.V.

Relying on *In re L.N.*, 278 Ill. App. 3d 46, 49 (1996), respondent argues that the State should not have been able to allege that she failed to protect G.V. since G.V. had been in foster care since being removed from her care. In *L.N.*, the Appellate Court, Third District, held that, if an injurious environment had been the basis for the child's initial removal from the parent and placement in foster care, it was not proper in a subsequent termination proceeding to allege the failure to protect the child from such an environment: "While

certainly respondent's alleged failure to protect the child could form the basis for the initial removal of the child from the home, we do not believe that such an allegation is relevant in a subsequent termination proceeding when the child has been in foster care." *L.N.*, 278 Ill. App. 3d at 49.

However, *L.N.* appears to be at odds with an earlier third district case, *In re Robertson*, 45 Ill. App. 3d 148 (1977). In *Robertson*, the court stated that only "a cursory comment" was necessary to reject the argument that it was error to consider evidence in support of the original neglect petition at a subsequent termination proceeding. *Robertson*, 45 Ill. App. 3d at 151. The court stated:

> "The issues before the trial court were whether Heather's parents were unfit and consequently whether the child's best interests demanded that all the natural parents' rights be permanently terminated. The earlier findings of Heather's neglect based on the initial petition's allegations of physical abuse and lack of proper care are highly relevant circumstances for establishing the type of environment to which Heather was subjected." *Robertson*, 45 Ill. App. 3d at 151.

We agree with *Robertson* rather than *L.N.*, both because it employs better reasoning and because *L.N.* reads an improper limiting provision into the statute. The failure to protect the child from an environment injurious to his welfare is one of the statutory grounds upon which a court can find a parent unfit, and we believe it was improper for *L.N.* to determine that such an allegation cannot form the basis for both the removal of the child from the home pursuant to a neglect petition and a termination of parental rights. The State proved by clear and convincing evidence that respondent failed to protect G.V. from an environment injurious to his welfare and she was thus unfit.

■ We do not need to consider whether the evidence also supported a finding of depravity. A finding of parental unfitness on any one ground obviates the need to review other statutory grounds alleged by the State. *In re B.R.*, 282 Ill. App. 3d 665, 671 (1996); see also *In re J.A.S.*, 255 Ill. App. 3d 822, 825 (1994) ("Because a finding of parental unfitness may be based on evidence sufficient to support any one statutory ground, even if the evidence is not sufficient to support other grounds alleged [citation], we need not address the issue of whether the State met its burden of proving the other two statutory grounds alleged in the petition").

■ Respondent's other argument is that the court erred in applying the wrong burden of proof at the termination phase of the hearing. After finding respondent unfit based upon clear and convincing

evidence, the cause proceeded to the second phase, where the inquiry is whether the best interests of the child require the termination of parental rights. The court stated that the clear and convincing evidence standard did not apply at this phase. Respondent relies upon the third district case *In re B.C.*, 247 Ill. App. 3d 803, 806-07 (1993), in which the appellate court held that the State did not prove by clear and convincing evidence that the termination of parental rights was in the child's best interests. However, the third district later conceded that it erred in *B.C.* and that the proper burden of proof is that the determination of the child's best interests is discretionary with the trial court: "We have re-examined this issue, however, and agree with the State that once a parent has been found unfit by clear and convincing evidence, the decision to terminate an individual's parental rights rests within the sound discretion of the trial judge." *V.O.*, 284 Ill. App. 3d at 691. We have previously held the same way. See *In re Allen*, 172 Ill. App. 3d 950, 959 (1988) ("The decision to terminate parental rights and to appoint a guardian rests within the sound discretion of the trial court, and the reviewing court should not interfere with its judgment absent an abuse of discretion"). Accordingly, we reject respondent's argument that the trial court applied the wrong burden of proof at the second phase of the hearing.

The judgment of the circuit court of Lake County is affirmed.

Affirmed.

DOYLE and RATHJE, JJ., concur.