788 N.E.2d 133 (2003)
338 Ill. App.3d 133
272 Ill.Dec. 829
In re D.T., a Minor (The People of the State of Illinois, Petitioner-Appellee,
v.
B.T., Respondent-Appellant).
No. 1-01-2410.
Appellate Court of Illinois, First District, Fourth Division.
March 27, 2003.
*136 Richard Cozzolla, Diana White, Kimberly Jordan, Colleen Connolly, Sheri Diaz, Ruth Giles Ott, The Legal Assistance Foundation of Metropolitan Chicago, Chicago, for Appellant.
Patrick T. Murphy, Charles P. Golbert, Rhonda S. Love, Office of the Cook County Public Guardian, Chicago, for Respondent-Appellee.
Richard A. Devine, Nancy Kisicki, Carrie E. Strobel, Cook County State's Attorneys Office, Chicago, for Petitioner-Appellee.
Presiding Justice THEIS delivered the opinion of the court:
Following an evidentiary hearing, the trial court found respondent mother, B.T., an unfit parent for failing to protect her son, D.T. (born December 18, 1993), from *137 conditions within his environment injurious to his welfare. 750 ILCS 50/1(D)(g) (West 2000). After a best interest hearing, the trial court terminated respondent's parental rights to D.T. on June 8, 2001.[1] Respondent appeals, arguing that (1) during the unfitness hearing, the trial court misinterpreted section 1(D)(g) of the Adoption Act (750 ILCS 50/1(D)(g) (West 2000)) by foreclosing consideration of any evidence that did not directly relate to respondent's past failing to protect D.T.; (2) the court erred in deciding that termination of respondent's parental rights was in D.T.'s best interests on the basis of its own discretion, without imposing a burden of proof on the State; (3) the court improperly failed to hold the State to a "clear and convincing" standard of proof or a "preponderance of the evidence" standard in the best interest hearing; (4) the State failed to meet its burden to prove that terminating respondent's rights was in D.T.'s best interests; and (5) the trial court's finding on best interests was incorrect and an abuse of discretion. We reverse and remand for further proceedings.

I. BACKGROUND
Following a hearing on February 5, 1998, the trial court granted temporary custody of four-year-old D.T. to the Department of Children and Family Services (DCFS). On May 5, 1998, following an adjudicatory hearing, the court found that D.T. had been physically abused by respondent's boyfriend, Brian Weisenritter, neglected due to respondent's failure to take D.T. to the hospital after he was injured, and subjected to an injurious environment. On May 27, 1998, the court appointed DCFS as D.T.'s guardian. Following another hearing on August 27, 1998, the court entered an order establishing the permanency goal as substitute care pending court determination on termination of parental rights.[2] On July 19, 1999, the State filed a supplemental petition for appointment of a guardian with right to consent to adoption alleging four separate allegations of unfitness. The State later amended the petition to allege only that respondent was unfit because she failed to protect D.T. from conditions in his environment injurious to his welfare. 750 ILCS 50/l(D)(g) (West 2000).
At the unfitness hearing held from September 2000 to April 2001, Dr. Alan Johnson, a physician at Children's Memorial Hospital, testified that he treated D.T. on February 2, 1998, after he was transferred from Ravenswood Hospital. D.T. had several bruises on his face, multiple cuts and bruises on his arm, various scratches on his back, and several bruises on his buttocks and thighs. Johnson testified that D.T. had a linear bruise on his left cheek that had the characteristic appearance of an opened-handed slap mark. His bruises were inconsistent with those of a normal four-year-old boy.
Johnson explained that D.T.'s scrotum was swollen to the size of an orange, approximately 5 to 10 times its normal size, and was dark purple. The bruising extended down his leg and up to his abdomen. D.T. was in a significant amount of pain from a puncture wound to the scrotum, which leaked bloody fluid. Johnson opined that D.T.'s scrotum injury had occurred more than 48 hours earlier. D.T. *138 underwent surgery to explore the nature and extent of his injuries, remained in the hospital for two to three days and required narcotic pain medication. Johnson testified that this injury was caused by repetitive blunt blows to the scrotum and that D.T. was a victim of child abuse. He stated that D.T.'s explanation for his injury, that he fell off the couch on to "some junk," was not consistent with his injury.
Charles Rocek, a child protective investigator with DCFS, testified that on February 2, 1998, he noticed 11 marks and bruises on D.T.'s face and 8 other circular bruises on his arms and chest. Respondent told Rocek that she had known her boyfriend, Weisenritter, for approximately two months at that time and had met him through a telephone dating service. She stated that she went to Weisenritter's house on Friday, but later told him that she arrived on Thursday, Wednesday or Tuesday. Respondent also told Rocek that Weisenritter left the apartment Friday night and did not return until Saturday morning. Rocek asked respondent how D.T. sustained the facial injuries, and she responded that he slipped and fell several times in the bathtub. Rocek also asked her how D.T. suffered his groin injury, and she responded that he fell off the couch on to "some junk" at Weisenritter's apartment. Respondent told Rocek that she did not seek medical care earlier because she did not think D.T. was in pain. On as many as 30 occasions during their two-month relationship, respondent saw Weisenritter wrap D.T. in a towel for several hours and strike him to control his behavior.
Rocek again spoke with respondent on February 4, 1998. During this conversation, respondent stated that she was present with D.T. and Weisenritter the entire weekend except for two instances when she left for several hours to shop for groceries. Respondent told Rocek that after she and D.T. left Weisenritter's house at approximately 7 p.m. on Sunday, February 1, 1998, she spoke with a friend, and three hours later, brought D.T. to the hospital. Respondent never stated that Weisenritter prevented her from leaving his apartment.
Lisa Froemel, a social worker at Children's Memorial Hospital, testified that she spoke with respondent on February 2, 1998. Respondent told her that she and D.T. went to Weisenritter's apartment on January 29. Respondent stated that she did not know how D.T. sustained his injuries, but she noticed some redness to D.T.'s penis on January 30. On January 31, respondent noticed that D.T.'s scrotum was "black and blue" and he told her that he fell off the couch. The next day, after D.T. complained of pain and she noticed his scrotum was swollen and bleeding, respondent took him to Ravenswood Hospital. Respondent told Froemel that D.T. sustained several bruises from slipping in the bathtub and running into the kitchen island, but had "no real explanation" for D.T.'s groin injury. Respondent also stated that she gave Weisenritter permission to spank D.T. on his buttocks as a form of discipline and she saw him wrap D.T. in a blanket on a number of occasions. Respondent told Froemel that she left D.T. with Weisenritter for 30 to 40 minutes that weekend, but, she never stated that she was not allowed to leave Weisenritter's apartment. D.T. told Froemel that respondent was not present when he was injured.
Sharon Marach testified that she was respondent's case manager from 1995 to 1997 at Open Door Clinic in Elgin, a service provider for individuals with lifethreatening illnesses. She testified that D.T. was always with respondent at her appointments and he appeared well cared for and happy. Respondent never told *139 Marach that Weisenritter abused her or D.T.
Kristen James testified that she was a clinical supervisor and therapist at The Children's Place Association, which provided services to families with life-threatening illnesses. D.T. entered The Children's Place Association day care program in the fall of 1997. D.T. was very bright, articulate and advanced for his age. After D.T.'s hospitalization, respondent attended parenting classes, domestic abuse counseling and all of her supervised visits with D.T. D.T. told James through play therapy that Weisenritter kicked him. Respondent never told James that Weisenritter prevented her from leaving the apartment.
Johanna Sonnenfeld, a therapist at Midwest Family Resource who was qualified as an expert in psychodynamic therapy, had counseled respondent since January 2000. She stated that respondent's parents physically abused her and she "turned off her awareness" of what was happening to cope. After her father abused respondent, respondent's mother did not protect her, was not supportive, minimized her injuries and did not seek medical attention. Sonnenfeld testified that respondent similarly disassociated from the situation and minimized D.T.'s injuries. Respondent told Sonnenfeld that Weisenritter kept the keys to respondent's car during the weekend she stayed with him, although she left the apartment to go grocery shopping. When she left Weisenritter's apartment, she realized the extent of D.T.'s injuries and brought him to the hospital.
Respondent testified that her parents physically abused her as a child. After she married D.T., Sr., and became pregnant, D.T., Sr., also became physically abusive. When D.T. was approximately one year old, respondent left D.T., Sr., and returned to her parents' house. She later learned that she had contracted a lifethreatening illness. In August 1997, she and D.T. moved to Chicago House, which provided low-income housing for individuals with her life-threatening illness. Respondent met Weisenritter through a telephone dating service in late December 1997. In January 1998, Weisenritter would wrap D.T. in a towel for 5 to 10 minutes as a form of discipline. At the time, respondent thought that this discipline was "okay," but now realized that it was abuse. She also allowed Weisenritter to spank D.T.'s buttocks once.
Respondent testified that she and D.T. went to Weisenritter's apartment on Thursday, January 29, 1998. That evening, she left the apartment for food. D.T. asked to accompany her, but respondent told him to stay with Weisenritter because the neighborhood was unsafe. Later, respondent learned from D.T. that Weisenritter had threatened to hurt him that night. When she put D.T. to bed that evening, she noticed a red mark on his abdomen and D.T. told her that he fell off the couch. D.T. never told respondent that Weisenritter hurt him, and she did not remember seeing any bruises on D.T. Weisenritter kept her car keys while she was in the apartment, although he did not physically prevent her from leaving. Respondent repeatedly told Weisenritter that she wanted to take D.T. to the doctor, but he told her that was unnecessary. Although she left the apartment three times that weekend, respondent never sought help. When she returned to her apartment on Sunday evening, she noticed D.T.'s groin injury and bruises. She went to her friend's apartment to return money and then brought D.T. to Ravenswood Hospital. Respondent admitted that it was her responsibility to protect D.T. In a visit with D.T. in April 1998, D.T. told respondent that Weisenritter hit him and kicked him in the stomach and groin with *140 his work boots. Respondent admitted that, at that time, she failed to protect D.T. from an injurious environment.
In rebuttal, the State presented the testimony of Ann Simonson, D.T.'s foster mother for 2 1/2 years at the time of the hearing. In January 1999, D.T. told her that when he was wrapped in the towel, he could not breathe and felt that he could not get away. D.T. also stated that he told respondent not to leave him alone with Weisenritter. At the conclusion of this hearing, the trial court found that the State had proved, by clear and convincing evidence, that respondent was unfit for failing to protect D.T. from an environment injurious to his welfare during the period from January 29 to February 1, 1998.
At the best interest hearing in May and June of 2001, the trial court took judicial notice of its previous finding of respondent's unfitness and the testimony from that hearing. Simonson testified that she had been D.T.'s foster mother since August 1998. D.T. called her "mom" and explained that respondent was the "mother who had me [and Simonson is] the mother who takes care of me." D.T. was very bright and in a gifted first-grade class, reading at a sixth-grade level. D.T. expressed to Simonson that he worried that respondent would not be able to take care of him if he went home with her. D.T. occasionally stated that he wanted to live with respondent, usually when he was angry with Simonson. D.T. initially had many "meltdowns" and tantrums, but these had greatly decreased in the previous year. D.T. also frequently discussed the incident when Weisenritter kicked him. During one visit between D.T. and respondent that Simonson supervised, D.T. asked respondent if she would get a job because he was very concerned about working and money. Simonson testified that she did not think D.T. would be at risk with respondent. She also stated that she wanted to adopt D.T.
John Arroyo testified that he had been D.T.'s therapist since September 2000. He stated that while D.T. was adapting well to his foster home, he had difficulty with peer relationships, got into fights and became frustrated at school. Arroyo stated that D.T. needed rules, boundaries and consequences and Simonson helped to set limits and boundaries. Emotionally, D.T. became upset easily because he did not understand what was happening in court. Arroyo believed that the length of the court proceedings was problematic for D.T. and that resolution of this case would help him. D.T. told Arroyo on different occasions that he wanted to live with respondent, Simonson, and respondent's mother. D.T. also stated that he wanted to live with respondent because she let him eat all the candy he wanted and he did not have to do chores. At Simonson's house, D.T. explained, he could only have two pieces of candy and he had to do chores and follow rules.
D.T. craved structure and rules and tested adults to determine who would provide him with stability and permanency. D.T. told Arroyo that he was tired of telling respondent to get a job. Arroyo never observed a visit between respondent and D.T. Arroyo did not have an opinion as to whether it was in D.T.'s best interests to terminate respondent's parental rights.
Thay Danielson, a social worker at The Children's Place Association, testified that she had been D.T.'s social worker since November 1999 and saw D.T. and Simonson interact on a monthly basis. She stated that D.T. had a "very close relationship with [Simonson]" and viewed her as a second mother. Danielson testified that while respondent's interactions with D.T. were appropriate and she set proper limits and *141 boundaries for him, respondent was not able to parent D.T. However, she also testified that D.T. had a very close relationship and a strong bond with respondent. D.T. needed a structured and controlled environment, which he received from Simonson. D.T. expressed many concerns about respondent's ability to care for herself and he became very anxious. Danielson stated that D.T. was secure with Simonson and removal from her home would be detrimental and traumatic. D.T. was very affectionate with both respondent and Simonson. Danielson stated that D.T. needed permanency and removing him from his foster home would cause anxiety and uncertainty. She opined that it was in D.T.'s best interests that respondent's parental rights be terminated.
Danielson testified that respondent was receiving in-depth counseling to address her childhood issues and had made "steady progress" in that area. Respondent also successfully completed both individual and group domestic violence treatment and had satisfactorily apprised The Children's Place Association of her relationships with other men. Danielson was concerned about D.T. in the middle of this situation and stated that D.T. had trouble fully attaching to Simonson because he was also attached to respondent. Initially, D.T. would cry when he ended visits with respondent, but this behavior dramatically decreased. D.T. told Danielson that if he could change anything in his life, he would visit respondent every day. Sonnenfeld told Danielson that respondent had made a breakthrough in the summer of 2000 in terms of understanding how her childhood impacted her behavior with D.T. and that although respondent had progressed in therapy, she needed two more years to fully address these issues before D.T. could return home. One week later, however, Sonnenfeld stated that it would only take nine months to a year.
Kathleen Pesek, called as a witness by the assistant public guardian, testified that she was the coordinator of the parenting assessment team at Threshold Mother's Project from January 1995 to December 2000. The parties stipulated that Pesek was an expert in child development and in assessing parenting capacity. She and the other members of the team read D.T.'s case records and met with respondent, D.T., and Simonson and observed interactions between them. Pesek testified that, in 1998, D.T. had an insecure attachment to respondent and stated that D.T. often displayed role reversal where he placed respondent's needs above his own. However, when she observed respondent and D.T. interact in 1999, she saw no evidence of role reversal. Pesek testified that the parenting assessment team did not make recommendations as to whether a child's goal should be return home or termination. She acknowledged that The Children's Place Association records noted that respondent was very attentive during visits, did not need coaching and expressed appropriate concern for D.T.'s safety. In December 1999, the team was concerned that respondent would not be able to make the necessary emotional shift to protect D.T. and that there was a substantial risk of maltreatment because of respondent's tendency to be dependant on others. At her deposition in February 2000, Pesek testified that she believed that while D.T. should remain with Simonson, continued visitation with respondent was in D.T.'s best interests. However, Pesek also stated that it would not be appropriate to return D.T. to respondent without supervision.
Maria Ferrera testified for respondent that she worked at The Children's Place Association and supervised D.T.'s case until January 2000, but she had no contact with the case after that date. She stated *142 that she had developed case plans for respondent that included domestic violence counseling, joining a battered women's group, participating in individual and family counseling and visitation with D.T. Respondent completed domestic violence counseling successfully, and as of January 2000, she was making slow but steady progress in individual counseling. Respondent also displayed a willingness to participate in counseling and even suggested increasing her sessions to twice a week. Ferrera supervised several visits during 1998 and 1999 and observed physical affection between respondent and D.T. When respondent was asked to set limits for D.T. during visitation, she "did fine" and showed improvement because she was able to put aside her own needs. Respondent received satisfactory ratings on her case plans.
James testified that respondent satisfactorily completed parenting classes and group and individual domestic violence counseling sessions and participated in individual and family therapy. She stated that she saw significant growth in respondent over the year she worked with her. Throughout the family sessions with D.T., D.T. expressed his desire to return to respondent. After the court ordered supervised visits in May 1998, D.T. "drastically deteriorated," became whiny, and clingy and had difficulty at school. After visitation increased in the summer of 1998, D.T.'s behavior improved. James stated that even though D.T. attached to his foster family, his attachment to respondent never faded. She opined that D.T. may have problems with other attachments as an adult as a result of terminating respondent's parental rights. James ended her relationship as D.T.'s case manager in January 1999 and had no contact with D.T. after January 2000.
Sonnenfeld testified that she had been respondent's therapist since January 2000. While respondent initially minimized what happened to D.T., she eventually became more assertive and less defensive through therapy. Respondent's nurturing and parenting skills were enhanced through these sessions. She stated that respondent was capable of keeping herself and D.T. safe from abusive relationships, although respondent needed at least one more year of therapy. Sonnenfeld testified that respondent had the capacity and competency to parent D.T. and breaking the attachment between respondent and D.T. would be harmful to him. Sonnenfeld last saw D.T. in December 1999 and she never saw D.T. interact with his foster family. The majority of the basis of Sonnenfeld's knowledge came from respondent's self-reports.
Dr. Frank Lani testified that he was a child psychologist on the parenting assessment team at Threshold Mother's Project. The court accepted Dr. Lani as an expert in the area of child psychology and evaluations of parenting custody issues. After interviewing and testing D.T. and respondent in November 1998, he found that there seemed to be an attachment between respondent and D.T. In 1998, he thought it was possible for D.T. to return home in a supervised living situation. Lani performed a follow-up evaluation in November 1999, without observing D.T. or respondent, which showed that respondent had made some improvement. At that time, respondent had been engaged in treatment and showed signs of growth. He admitted that he had no contact with respondent or D.T. since November 1998 and he never observed D.T. with his foster family.
Danielson testified that she observed a visit between respondent and D.T. on May 21, 2001, where D.T. stated that he wanted the judge to "make up his mind" and he wanted to return home to respondent. *143 Danielson continued to believe that respondent's parental rights should be terminated. D.T. had also told Danielson that he wanted to remain with Simonson.
Respondent testified that after the incident, she participated in parenting classes, group and individual therapy, and domestic violence counseling and obtained an order of protection against Weisenritter. Respondent explained what she learned in these sessions and the emotional progress she made in dealing with her abusive childhood. D.T. repeatedly told her that he wanted to return home to her. Ideally, she wanted D.T. to live with her, but she was willing to give guardianship to Simonson. Respondent also stated that she would be willing to name Simonson in a stand-by adoption plan. She stated that she loved D.T. and could keep him safe.
The trial court found, within its sound discretion, that it was in D.T.'s best interests to terminate respondent's parental rights. The court credited Simonson, finding that D.T.'s physical and emotional health had greatly improved since his placement with her, and Arroyo, who testified that D.T. needed resolution to this case. Additionally, the court relied on Danielson's recommendation that termination was in D.T.'s best interests. The court gave little weight to the testimonies of Ferrera, James, Sonnenfeld and Lani because they had no contact with the case in over a year and a half and, therefore, their testimonies provided little insight as to the best interests of D.T. in June 2001. The court noted the severity of D.T.'s injuries and respondent's inability to protect her child or seek immediate medical attention and considered all of the best interest factors enumerated in the Juvenile Court Act of 1987 before terminating respondent's parental rights. 705 ILCS 405/1-3(4.05) (West 2000). Respondent then filed this timely appeal.

II. ANALYSIS
Under the Juvenile Court Act of 1987 (705 ILCS 405/1 et seq. (West 2000)) and the Adoption Act (750 ILCS 50/1 et seq. (West 2000)), the involuntary termination of parental rights involves a two-step process. In re D.F., 201 Ill.2d 476, 494, 268 Ill.Dec. 7, 777 N.E.2d 930, 940 (2002). First, the State must show by clear and convincing evidence that the parent is "unfit," as that term is defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2000)). D.F., 201 Ill.2d at 494-95, 268 Ill.Dec. 7, 777 N.E.2d at 940. Although section 1(D) sets forth several grounds under which a parent may be found "unfit," any one ground, properly proven, is sufficient for a finding of unfitness. 750 ILCS 50/1(D) (West 2000); In re C.W., 199 Ill.2d 198, 210, 262 Ill.Dec. 802, 766 N.E.2d 1105, 1113 (2002). At this stage, the court focuses on the parent's conduct and cannot consider the child's best interests. In re Adoption of Syck, 138 Ill.2d 255, 276, 149 Ill.Dec. 710, 562 N.E.2d 174, 183 (1990); In re Tashika F., 333 Ill.App.3d 165, 169, 266 Ill.Dec. 742, 775 N.E.2d 304, 307 (2002). We will reverse a trial court's finding of unfitness only where it is against the manifest weight of the evidence. C.W., 199 Ill.2d at 211, 262 Ill.Dec. 802, 766 N.E.2d at 1113. If the court makes a finding that the parent is unfit, the court next considers whether it is in the child's best interests to terminate parental rights. 705 ILCS 405/2-29(2) (West 2000); D.F., 201 Ill.2d at 495, 268 Ill.Dec. 7, 777 N.E.2d at 940.

A. Unfitness
Respondent first challenges the trial court's finding that she was unfit under section 1(D)(g) of the Adoption Act, which provides that unfitness may be based on the "[f]ailure to protect the *144 child from conditions within his environment injurious to the child's welfare." 750 ILCS 50/l(D)(g) (West 2000). She argues that the court erred in adopting a "past-only focus" and restricting the scope of the unfitness hearing to the four-day period from January 29 to February 1, 1998, when D.T. was injured and before respondent sought medical attention. Respondent contends that the court misinterpreted the statute and unconstitutionally applied it to her by excluding evidence concerning her efforts to protect and care for D.T. before and after that time period. The State and assistant public guardian on behalf of D.T. respond that the Illinois Supreme Court analyzed section 1(D)(g) and rejected these arguments in In re C.W., 199 Ill.2d 198, 262 Ill.Dec. 802, 766 N.E.2d 1105 (2002). Respondent seems to concede in her reply brief and at oral argument that C.W. resolved this argument.
We agree that C.W. settled this issue. In C.W., our supreme court held that under the plain language of section 1(D)(g), evidence in support of this unfitness ground must focus on the child's environment and the parent's failure to protect before removal of the child from the injurious home environment. C.W., 199 Ill.2d at 214-15, 262 Ill.Dec. 802, 766 N.E.2d at 1115. Further, the court found that an unfitness finding under section l(D)(g) can be based on evidence of the parent's conduct that gave rise to the removal of the child. Thus, evidence of the parent's conduct after the removal of the child is irrelevant to a section l(D)(g) unfitness finding. C.W., 199 Ill.2d at 218, 262 Ill.Dec. 802, 766 N.E.2d at 1117. The court reasoned that "evidence that a parent substantially completed offered services, or otherwise refrained from prior objectionable conduct following removal of the child, does not somehow absolve or erase the parent's initial failing that triggered State intervention and removal of the child." C.W., 199 Ill.2d at 217, 262 Ill.Dec. 802, 766 N.E.2d at 1116. Such evidence is appropriately considered at the best interest stage of the termination of parental rights hearing. C.W., 199 Ill.2d at 217, 262 Ill.Dec. 802, 766 N.E.2d at 1116.
Therefore, in the present case, the trial court properly based its unfitness finding only on respondent's conduct before D.T.'s removal and correctly limited the scope of respondent's unfitness hearing to respondent's failure to protect D.T. from January 29 through February 1, 1998. Further, after reviewing the evidence admitted at the unfitness hearing, including respondent's admission that she failed to protect D.T. during that four-day period, we hold that the trial court's finding that respondent was unfit under section l(D)(g) was not against the manifest weight of the evidence.

B. Best Interests
After a parent has been found unfit, the court conducts a separate hearing that focuses on whether termination of the parent's rights is in the child's best interests. Tashika F., 333 Ill.App.3d at 170, 266 Ill.Dec. 742, 775 N.E.2d at 307. Even after a parent has been found unfit, it does not automatically follow that the parent cannot remain the child's legal parent with the attendant rights and privileges. In re M.S., 302 Ill.App.3d 998, 1003, 235 Ill.Dec. 969, 706 N.E.2d 524, 528 (1999). The question of what is in the best interests of the child should not be treated lightly. In re G.L., 329 Ill.App.3d 18, 25, 263 Ill.Dec. 607, 768 N.E.2d 367, 372 (2002). When determining whether termination of parental rights is in a child's best interests, the court must consider the following factors in the context of the child's age and developmental needs: (1) the child's physical safety and welfare; (2) the *145 development of the child's identity; (3) his background and ties, including familial, cultural and religious; (4) his sense of attachments, including love, security, familiarity, and continuity of affection, and the least disruptive placement alternative; (5) his wishes; (6) his community ties; (7) his need for permanence, including his need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2000). A trial court's finding that termination of a parent's rights is in the child's best interests will not be reversed unless it is against the manifest weight of the evidence. In re D.M., 336 Ill.App.3d 766, 271 Ill.Dec. 86, 784 N.E.2d 304 (2002); In re M.F., 326 Ill.App.3d 1110, 1115-16, 261 Ill.Dec. 132, 762 N.E.2d 701, 706 (2002).
Respondent argues that the trial court incorrectly found that the best interest determination rested within its sound discretion and improperly failed to hold the State to any burden of proof during the best interest hearing. Further, respondent argues that due process concerns require the court to impose upon the State a "clear and convincing evidence" standard of proof citing Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), and Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Alternatively, respondent asserts that the State should bear the burden to prove by a preponderance of the evidence that termination of a parent's rights is in the child's best interests.
The State concedes that it has the burden to show that termination is in the child's best interests. However, the State contends that "sound discretion" is a sufficient burden of proof at the best interest hearing, explaining that this standard is well-established in case law. If this court were to reject sound discretion as a burden of proof, the State asserts that a preponderance of the evidence standard is the proper burden. While respondent urges this court to adopt a clear and convincing evidence standard, the State rejects that standard, contending that Santosky does not mandate such a burden at the best interest stage, and instead suggests that a lower burden is appropriate. The assistant public guardian on behalf of D.T. asserts that there is no burden of proof at the best interest hearing, but if a burden exists, it is a preponderance of the evidence.
First, we agree with respondent that "sound discretion" is not a burden of proof. "Burden of proof is defined as "[a] party's duty to prove a disputed assertion or charge" and includes both the burden of production and the burden of persuasion. Black's Law Dictionary 190 (7th ed.1999). The burden of production is "[a] party's duty to introduce enough evidence on an issue to have the issue decided by the fact-finder, rather than decided against the party in a peremptory ruling," while the burden of persuasion includes "[a] party's duty to convince the fact-finder to view the facts in a way that favors that party." Black's Law Dictionary 190 (7th ed.1999). An issue is "proved" when the court is convinced by the data submitted that the alleged fact is true. 2 J. Strong, McCormick on Evidence § 336, at 409 (5th ed.1999).
Illinois courts recognize only three burdens of proof in civil cases: (1) the preponderance of the evidence standard; (2) the clear and convincing evidence standard; and (3) the proof beyond a reasonable doubt standard. 2 J. Strong, McCormick on Evidence §§ 339, 341, at 421, 432 (5th ed.1999). See also In re N.B., 191 Ill.2d *146 338, 343, 246 Ill.Dec. 621, 730 N.E.2d 1086, 1088 (2000) (State bears the burden of proving abuse, neglect or dependence by a preponderance of the evidence); Schrager v. North Community Bank, 328 Ill.App.3d 696, 703, 262 Ill.Dec. 916, 767 N.E.2d 376, 381 (2002) (a claim of fraudulent misrepresentation requires clear and convincing evidence); People v. Trainor, 196 Ill.2d 318, 324-28, 256 Ill.Dec. 813, 752 N.E.2d 1055, 1059-61 (2001) (while the proceeding is civil, the burden of proof required to commit a defendant to confinement as a sexually dangerous person is proof beyond a reasonable doubt). In support of its contention that sound discretion is a sufficient burden of proof in a best interest hearing, the State cites In re G.L., 329 Ill.App.3d 18, 263 Ill.Dec. 607, 768 N.E.2d 367 (2002), In re D.L., 326 Ill.App.3d 262, 260 Ill.Dec. 125, 760 N.E.2d 542 (2001), In re CM., 319 Ill.App.3d 344, 253 Ill.Dec. 183, 744 N.E.2d 916 (2001), In re Sheltanya S., 309 Ill. App.3d 941, 243 Ill.Dec. 441, 723 N.E.2d 744 (1999), In re D.J.S., 308 Ill.App.3d 291, 241 Ill.Dec. 765, 719 N.E.2d 1168 (1999), In re J.J., 307 Ill.App.3d 71, 240 Ill.Dec. 252, 716 N.E.2d 846 (1999), and In re G.V., 292 Ill.App.3d 301, 226 Ill.Dec. 303, 685 N.E.2d 406 (1997). In these cases, the courts merely repeat that the best interest decision is within the sound discretion of the trial court, citing "well-established case law," and summarily dismiss the parents' claims that the clear and convincing standard applies. These cases do not contain any analysis of the appropriate burden of proof or consider the application of a preponderance of the evidence standard. In this case, we are asked to consider both issues.
We first determine that the State, as the petitioner, bears the burden of proof in both the unfitness and best interest stages of a termination of parental rights hearing. M.F., 326 Ill.App.3d at 1116, 261 Ill.Dec. 132, 762 N.E.2d at 706-07. See also In re D.S., 198 Ill.2d 309, 322, 261 Ill.Dec. 281, 763 N.E.2d 251, 258 (2001), quoting People v. Piccolo, 275 Ill. 453, 455, 114 N.E. 145 (1916) ("[i]t has long been established that, upon the filing of a petition under the Juvenile Court Act, the `people become the real party complainant and must prosecute the proceeding'"). Although M.F. clarifies this issue, it does not specify which burden of proof applies, a preponderance, clear and convincing or beyond a reasonable doubt. We first look to the language of the statutes.
Although the Juvenile Court Act of 1987 (705 ILCS 405/1 et seq. (West 2000)) and the Adoption Act (750 ILCS 50/1 et seq. (West 2000)) repeatedly explain that the State carries the burden at the unfitness stage by clear and convincing evidence, neither act specifies the proper burden of proof at the best interest hearing. See, e.g., 705 ILCS 405/1-3(4.05) (West 2000) ("[w]henever a `best interest' determination is required, the following factors shall be considered"); 705 ILCS 405/2-29(2) (West 2000) ("[i]f * * * the court finds that it is in the best interest of the minor that parental rights be terminated * * * the court, * * * after finding, based upon clear and convincing evidence, that a parent is an unfit person as defined in Section 1 of the Adoption Act, may terminate parental rights"); 750 ILCS 50/8(a)(1) (West 2000) (consent for adoption is required unless the person is found by the court "to be an unfit person as defined in Section 1 of this Act, by clear and convincing evidence").
Respondent cites Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), and argues that Santosky mandates the imposition of the clear and convincing evidence standard in a best interest hearing. In Santosky, the United States Supreme Court reviewed a New *147 York statute that allowed the State to terminate the rights of parents in their natural child upon a finding at the fact-finding hearing, the first stage in the bifurcated permanent neglect proceeding, by a "fair preponderance of the evidence" that the child was "permanently neglected." Santosky, 455 U.S. at 747, 102 S.Ct. at 1391, 71 L.Ed.2d at 603. In holding the statute unconstitutional, the Court recognized the fundamental liberty interest natural parents have in the care, custody, and management of their children and rejected respondent's claim that a parental rights termination proceeding does not interfere with this fundamental interest. The Court analyzed the statute's due process implications under the Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), factors and held that "[b]efore a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence." Santosky, 455 U.S. at 747-48, 102 S.Ct. at 1391-92, 71 L.Ed.2d at 603. Our supreme court adopted this analysis in In re Enis, 121 Ill.2d 124, 133-34, 117 Ill.Dec. 201, 520 N.E.2d 362, 367 (1988).
Respondent contends that New York's fact-finding hearing is equivalent to both our unfitness and best interest hearings, and thus, Santosky requires a clear and convincing standard at both stages. Because the language of Santosky makes clear that the fact-finding stage is comparable only to Illinois's unfitness determination, we reject her argument.
Santosky explains that the New York statute bifurcated its permanent neglect proceeding into fact-finding and dispositional hearings. After the State establishes parental unfitness and proves that the child has been permanently neglected at the initial fact-finding stage, the court then "determines at a subsequent dispositional hearing what placement would serve the child's best interests." Santosky, 455 U.S. at 748, 102 S.Ct. at 1392, 71 L.Ed.2d at 603. The Court noted that the fact-finding hearing "pits the State directly against the parents" and is not intended to balance the child's interest in a normal family home against the parents' interest in raising the child, and "the focus emphatically is not on" the child or his foster parents. Santosky, 455 U.S. at 759, 102 S.Ct. at 1398, 71 L.Ed.2d at 610. Victory by the State at the fact-finding hearing "entails a judicial determination that the parents are unfit to raise their own children." Santosky, 455 U.S. at 760, 102 S.Ct. at 1398, 71 L.Ed.2d at 611. Further, the Court found that "[a]ny parens patriae interest in terminating the natural parents' rights arises only at the dispositional phase, after the parents have been found unfit." Santosky, 455 U.S. at 767 n. 17, 102 S.Ct. at 1402 n. 17, 71 L.Ed.2d at 615 n. 17. Thus, New York's fact-finding hearing corresponds only to Illinois's unfitness hearing while the dispositional stage in New York is equivalent to our best interest hearing. See also In re D.L., 326 Ill. App.3d 262, 271, 260 Ill.Dec. 125, 760 N.E.2d 542, 549 (2001) ("Santosky did not hold, as respondents argue, that the State prove that termination of parental rights is in the best interests of the child by clear and convincing evidence"); M.F., 326 Ill. App.3d at 1116, 261 Ill.Dec. 132, 762 N.E.2d at 707 ("both Santosky and Enis were dealing with the applicable standard of proof necessary in the context of an unfitness finding"); In re M.H., 313 Ill. App.3d 205, 213, 246 Ill.Dec. 86, 729 N.E.2d 86, 93 (2000), aff'd, 196 Ill.2d 356, 256 Ill.Dec. 297, 751 N.E.2d 1134 (2001) (Santosky "elevated the burden of proof necessary to support a finding of unfitness to clear and convincing evidence").
*148 Further, Santosky implies that a lesser burden of proof is permitted at the best interest hearing. In holding that use of the preponderance of the evidence standard at the fact-finding hearing did not comport with due process, the Court noted that until the State proved parental unfitness at that hearing, "the child and his parents share a vital interest in preventing erroneous termination of their natural relationship." Santosky, 455 U.S. at 760, 102 S.Ct. at 1398, 71 L.Ed.2d at 611. Thus, at the fact-finding stage, because the interests of the child and his parents coincide to favor the use of error-reducing procedures, the State bears the risk of an erroneous result by proving that the parent is unfit by clear and convincing evidence. At the dispositional hearing, however, the child's and parents' interests diverge, and therefore, due process does not demand the same heightened standard of proof. D.L., 326 Ill. App.3d at 271, 260 Ill.Dec. 125, 760 N.E.2d at 549.
Respondent cites authority from other jurisdictions that impose a clear and convincing evidence standard in the equivalent of Illinois's best interest stage of a termination proceeding. See, e.g., Ark. Code Ann. § 9-27-341(b)(3)(A) (Michie 2000); Conn. Gen.Stat. § 45a 717(g) (West 2000); In re J.W., 779 N.E.2d 954, 959 (Ind.Ct. App.2002); Ky.Rev.Stat. Ann. § 625.090(1) (Michie 2000); Me.Rev.Stat. Ann. 12A, § 4055(1)(B)(2) (West 2000); In re Parental Rights as to K.D.L., 58 P.3d 181, 186 (Nev.2002); Ohio Rev.Code Ann. § 2151.414(B)(1) (West 2000); S.D. Codified Laws § 26-8A-27 (Michie 2000); Utah Code Ann. § 78-3a-406(3) (2000); Va.Code Ann. § 16.1-283(B) (Michie 2000). While respondent is correct that many states employ a clear and convincing standard, several other states use the preponderance of the evidence standard. See, e.g., Alaska Child in Need of Aid R. 18(c)(2)(C) (West 2000) (preponderance); In re Guardianship Jolie S., 298 A.D.2d 194, 748 N.Y.S.2d 367, 368 (2002) (preponderance); In re Dependency of A.S., 101 Wash.App. 60, 6 P.3d 11, 18 (2000) (preponderance). The fact that these states utilize two different and distinct standards suggests that Santosky does not mandate the application of the clear and convincing evidence standard at the best interest hearing.
Aside from her reliance on Santosky, respondent also urges us to consider whether due process considerations require the imposition of the clear and convincing evidence standard. The due process clause of the fourteenth amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, § 1. The due process clause guarantees "`heightened protection against government interference with certain fundamental rights and liberty interests.'" In re M.H., 196 Ill.2d 356, 362, 256 Ill.Dec. 297, 751 N.E.2d 1134, 1139 (2001), quoting Washington v. Glucksberg, 521 U.S. 702, 720, 117 S.Ct. 2258, 2267, 138 L.Ed.2d 772, 787 (1997). Both the United States Supreme Court and the Illinois Supreme Court have recognized the fundamental liberty interest natural parents have in the care, custody, and control of their children. Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49, 56 (2000); Santosky, 455 U.S. at 753, 102 S.Ct. at 1394-95, 71 L.Ed.2d at 606; Lassiter v. Department of Social Services, 452 U.S. 18, 27, 101 S.Ct. 2153, 2159-60, 68 L.Ed.2d 640, 649-50 (1981); M.H., 196 Ill.2d at 362, 256 Ill.Dec. 297, 751 N.E.2d at 1139; Enis, 121 Ill.2d at 128-29, 117 Ill.Dec. 201, 520 N.E.2d at 365. Further, Santosky established that parental rights termination proceedings interfere with this fundamental liberty interest and, therefore, must meet *149 the requirements of the due process clause. Santosky, 455 U.S. at 753-54, 102 S.Ct. at 1394-95, 71 L.Ed.2d at 606-07; M.H., 196 Ill.2d at 363, 256 Ill.Dec. 297, 751 N.E.2d at 1140. As the Santosky Court noted, "[w]hen the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." Santosky, 455 U.S. at 759, 102 S.Ct. at 1397, 71 L.Ed.2d at 610.
In Santosky, the Court reiterated that the nature of the process due in parental rights termination proceedings involves balancing the three factors first delineated in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Santosky, 455 U.S. at 754, 102 S.Ct. at 1395, 71 L.Ed.2d at 607, citing Lassiter, 452 U.S. at 27, 101 S.Ct. at 2159, 68 L.Ed.2d at 649. The Mathews factors are: (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of the interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute safeguards would entail. Mathews, 424 U.S. at 335, 96 S.Ct. at 903, 47 L.Ed.2d at 33.
Applying the first factor to the clear and convincing standard of proof, we recognize two competing private interests at stake in the best interest stage of a termination of parental rights proceeding. The first is the interest of a parent in the custody, care and control of her child and in maintaining a parental relationship with that child. In re Vanessa C., 316 Ill. App.3d 475, 481, 249 Ill.Dec. 399, 736 N.E.2d 593, 598 (2000). This interest is fundamental and will not be extinguished lightly. M.H., 196 Ill.2d at 365, 256 Ill. Dec. 297, 751 N.E.2d at 1141. "Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life." Santosky, 455 U.S. at 753, 102 S.Ct. at 1395, 71 L.Ed.2d at 606. Additionally, the child has an important interest in a loving, stable and safe home environment, which may not involve any relationship with her natural parent. While she has a stake in preserving some kind of relationship with her natural parent, she may also have an interest in maintaining a relationship with her foster parents. At this hearing, the interests of the parents and child diverge and they may become adversaries. Santosky, 455 U.S. at 760, 102 S.Ct. at 1398, 71 L.Ed.2d at 611.
Under the second Mathews factor, we next consider the risk of erroneous deprivation of the child's and parent's interests resulting from the use of the clear and convincing evidence standard and the probable value, if any, of additional or substitute procedural safeguards. "The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to `instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.' Addington v. Texas, 441 U.S. 418, 423, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323, 329 (1979), quoting In re Winship, 397 U.S. 358, 370, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368, 379 (1970) (Harlan, J., concurring). The minimum standard of proof tolerated by the due process clause "reflects not only the weight of the private and public interests affected, but also a societal judgment about how the risk of error should be distributed between the litigants." Santosky, 455 U.S. at 755, 102 S.Ct. at 1395, 71 L.Ed.2d at 607.
*150 Thus, under this factor, we must balance the rights of the child versus the rights of the parent to determine who should shoulder the risk of error at the best interest hearing. By this stage, the parent has been found unfit by clear and convincing evidence. While the parent retains a fundamental interest, the proper focus of this hearing is on the child. See Tashika F., 333 Ill.App.3d at 170, 266 Ill. Dec. 742, 775 N.E.2d at 307. Once a finding of unfitness has been made, all considerations, including the parent's rights, must yield to the best interest of the child. G.L., 329 Ill.App.3d at 24, 263 Ill.Dec. 607, 768 N.E.2d at 372; Tashika F., 333 Ill. App.3d at 170, 266 Ill.Dec. 742, 775 N.E.2d at 307. Further, "a parent's right or interest in his child does not amount to an absolute vested right." In re S.W., 315 Ill.App.3d 1153, 1156, 249 Ill.Dec. 102, 735 N.E.2d 706, 709 (2000). In proceedings under the Juvenile Court Act, the primary concern is the best interests of the child and the "parents' right to the custody of their child shall not prevail when the court determines that it is contrary to the health, safety, and best interests of the child." 705 ILCS 405/l-2(3)(c) (West 2000). See also In re Andrea F., 327 Ill.App.3d 1072, 1079, 262 Ill.Dec. 164, 764 N.E.2d 1281, 1287 (2002). After balancing these interests, we find that the child's interest is of paramount concern at the best interest hearing and determine that the child should not bear the risk of error at this proceeding. The use of the clear and convincing evidence standard would unfairly place a significant burden of proof on the State to the detriment of the child. Additionally, the application of the clear and convincing standard would provide an unfit parent with greater protection at the child's expense. Because the child's interest trumps that of the parent during the best interest hearing, we find that a heightened burden of proof is not required.
Lastly, we must consider the governmental interests involved in the best interest stage of a termination of parental rights proceeding and any burdens that a higher standard of proof would place on those interests. The State has two interests at stake in termination proceedings: a parens patriae interest in preserving and promoting the welfare of the child and a fiscal and administrative interest in reducing the cost and burden of such proceedings. Santosky, 455 U.S. at 766, 102 S.Ct. at 1401, 71 L.Ed.2d at 615. The State also has a parens patriae interest in terminating the natural parent's rights after he or she has been found unfit. Santosky, 455 U.S. at 767 n. 17, 102 S.Ct. at 1402 n. 17, 71 L.Ed.2d at 615 n. 17. Once a parent has been found unfit by clear and convincing evidence at the first stage, the State's interest in protecting the child is sufficiently compelling to allow the termination of parental rights. In re R.C., 195 Ill.2d 291, 308, 253 Ill.Dec. 699, 745 N.E.2d 1233, 1244 (2001). Thus, the use of the higher clear and convincing evidence standard is unnecessary.
After balancing the Mathews factors, we conclude that due process concerns do not require the imposition of the clear and convincing evidence standard at a best interest hearing. Rather, we will apply the usual standard of proof in civil cases, the preponderance of the evidence standard.[3] *151 2 J. Strong, McCormick on Evidence § 339, at 421 (5th ed.1999). This standard fairly allocates the risk of error by imposing upon the State the burden to prove that it is more likely than not that termination of the parent's rights is in the child's best interests. Additionally, the preponderance standard adequately protects the parent's fundamental right to the care and custody of her child, the child's right to a safe, loving and secure environment and the State's parens patriae interests.
Accordingly, we hold that, at the best interest stage in a termination of parental rights proceeding, the State bears the burden to prove that termination is in the child's best interests by a preponderance of the evidence. In meeting its burden, the State must present evidence supporting the best interest factors delineated in the Juvenile Court Act. See 705 ILCS 405/1-3(4.05) (West 2000). In determining whether the State met this burden of proof, the trial court must make credibility determinations and factual findings supporting its final decision to terminate the parent's rights. Next, the Juvenile Court Act dictates that the best interests factors "shall be considered in the context of the child's age and developmental needs." 705 ILCS 405/1-3(4.05) (West 2000). By using the phrase "shall be considered," the legislature implied that when considering and weighing these factors and arriving at the ultimate decision whether termination of the parent's rights are in the child's best interests, the trial court should exercise its discretion. On appeal, we review the trial court's factual findings under a manifest weight of the evidence standard. In re D.M., 336 Ill.App.3d at 773, 271 Ill.Dec. 86, 784 N.E.2d 304; M.F., 326 Ill.App.3d at 1115-16, 261 Ill.Dec. 132, 762 N.E.2d at 706. A decision is against the manifest weight of the evidence if the facts clearly demonstrate that the court should have reached the opposite conclusion. D.M., 336 Ill.App.3d at 773, 271 Ill.Dec. 86, 784 N.E.2d 304.
Applying this burden of proof and appellate review to this case, we find that the State failed to prove by a preponderance of the evidence that termination of respondent's parental rights was in D.T.'s best interests. Thus, the trial court's decision to terminate respondent's rights was against the manifest weight of the evidence. While there was some evidence to support the trial court's decision, the bulk of the evidence weighed against termination. Specifically, the evidence from the State's witnesses did not show a benefit to D.T. from terminating respondent's parental rights nor did it reveal that continued contact with respondent would harm him. Only one witness, Danielson, testified that termination of respondent's parental rights would be in D.T.'s best interests. While D.T. was close to Simonson, Danielson stated that he had a strong bond and very close relationship with respondent and was very affectionate with her. While Arroyo testified that D.T. needed rules, boundaries and limits and stated that Simonson provided this structure, he had never observed a visit between respondent and D.T. Additionally, Danielson testified that respondent acted appropriately with D.T. and set proper limits and boundaries during visits. Simonson testified that although she wanted to adopt D.T., she did not believe that he would be at risk with respondent. D.T. told Danielson that he wanted to visit respondent every day and also told her in May 2001 that he wanted to return home to respondent. The Children's Place Association records noted that respondent was very attentive during visits, did not need coaching, and expressed appropriate concern for D.T.'s safety. Further, in February 2000, Pesek believed *152 that continued visitation with respondent was in D.T.'s best interests. Respondent's therapist, Sonnenfeld, testified that breaking the attachment between respondent and D.T. would be harmful to him. There was also substantial evidence that respondent completed many domestic violence and parenting classes, participated in individual and family counseling sessions, made steady progress in therapy and attended all of her visits with D.T. Therefore, the evidence did not establish that it would be in D.T.'s best interests to terminate respondent's parental rights.
Therefore, we hold that the trial court's decision to terminate respondent's parental rights to D.T. was against the manifest weight of the evidence. We reverse this case and remand for further proceedings.
Reversed and remanded.
GREIMAN and KARNEZIS, JJ., concur.
NOTES
[1] The court also terminated the parental rights of D.T.'s father, D.T., Sr., but he is not a party to this appeal.
[2] Respondent appealed from the August 27, 1998 permanency order and this court remanded the case with directions to reassign it to another judge. In re D.T., No. 1-98-4175, 312 Ill.App.3d 1195, 264 Ill.Dec. 65, 769 N.E.2d 567 (March 31, 2000) (unpublished order pursuant to Supreme Court Rule 23).
[3] Respondent does not argue that the proof beyond a reasonable doubt standard applies at this hearing. Even if we were to consider the application of this standard, we would reject it. First, proof beyond a reasonable doubt is rarely used in civil cases. 2 J. Strong, McCormick on Evidence § 341, at 432 (5th ed.1999). Additionally, because Santosky implies that a lesser burden than clear and convincing evidence is permissible at the best interest stage, the higher standard, beyond a reasonable doubt, is not applicable.