615 N.E.2d 1346 (1993)
246 Ill. App.3d 330
186 Ill.Dec. 289
In re E.S., C.S., N.S., and P.S., Minors (The People of the State of Illinois, Petitioner-Appellee, v. Shelly Coleman, Respondent-Appellant).
No. 4-92-0541.
Appellate Court of Illinois, Fourth District.
June 30, 1993.
*1347 Gregg W. Bonelli, Mattoon, for respondent-appellant.
C. Stephen Ferguson, State's Atty., Charleston, Norbert J. Goetten, Director, State's Attys. Appellate Prosecutor, Robert J. Biderman, Deputy Director, Springfield, James Majors, Staff Atty., for petitioner-appellee.
Justice McCULLOUGH delivered the opinion of the court:
On June 25, 1992, the parental rights of Shelly Coleman to her four minor daughters, E.S. (born February 27, 1985), C.S. (born January 18, 1983), P.S. (born July 17, 1981), and N.S. (born May 15, 1979), were terminated. Shelly has appealed, contending (1) the trial court erred by failing to grant her motion for witness fees and (2) its finding of unfitness was against the manifest weight of the evidence. She also contends the trial court erred in refusing to find she was entitled to the benefits of a purported settlement agreement in the United States District Court in Norman v. Suter (N.D.Ill.), No. 89-C-1624. We affirm.
On September 28, 1988, a child protection investigator for the Illinois Department of Children and Family Services (DCFS) received a hotline report concerning Shelly and her daughters alleging environmental neglect and inadequate shelter. The investigator proceeded to the given address and found Shelly and her daughters living in a filthy, rodent-infested apartment. The entire floor of the apartment was covered with garbage, food, dirty clothes, and cockroaches. Open food containers were visible on the kitchen counter and the upstairs bathroom was nonfunctional.
The children were removed from the home, and the following day a petition for a finding of neglect was filed alleging Shelly:
"(A) does not provide the proper and necessary support or other care necessary for their [her daughters'] well[-]being, in that [she] maintains the home in a general filthy condition.
(B) And whose environment is injurious to the welfare and that the home is in a filthy condition with garbage and dirty clothing throughout the home and that the home is infested with cockroaches."
A shelter-care hearing was held on October 5, 1988. Temporary custody and guardianship was placed with DCFS. An order of adjudication was entered October 27, 1988, finding the children to be neglected minors. A dispositional order was entered June 13, 1989, awarding custody and guardianship to DCFS and ordering respondent to comply with service plans and follow and complete mental health treatment deemed necessary.
On February 27, 1992, the State filed an amended petition for the termination of Shelly's parental rights alleging she had failed to make reasonable efforts to correct the conditions which were the basis for the removal of the children or to make reasonable progress toward the return of the children within 12 months after the adjudication of neglect. (Ill.Rev.Stat.1991, ch. 40, par. 1501(D)(m).) A hearing on this amended petition was held on June 10, 11, 19 and 25, 1992.
Gale Steidl was the first DCFS caseworker assigned to Shelly when the children were removed from the home in 1988. Steidl reviewed the five client service plans she created for Shelly between October 1988 and October 1990. She noted the objectives in each were essentially the *1348 same, namely, develop regular visitation with the children, provide a structurally safe and protective living residence, demonstrate money-management skills, cooperate and meet with a homemaker and attend mental health counseling. With the exception of the regular visitation, Shelly had unsatisfactory progress in every objective for this entire two-year period. She failed to maintain a suitable residence for any length of time. Between October 1988 and March 1989, the period of the review of the first client service plan, Shelly had four temporary residences, made excuses about moving from each one, entered into illegal leases, and had conflicts with the owners of the places she leased because of her alleged thefts. Shelly failed to meet all of the other objectives, including failing to meet with the homemaker or attend mental health counseling. She had obtained no permanent job. At this time, the permanency goal for the children was "return home."
In March 1989, a new plan was made with the same objectives. In October 1989, that plan was reviewed and Shelly had unsatisfactory progress in every single objective, including visitation with the children. A new plan was developed at this time with new objectives, including that she (1) demonstrate in counseling that she accepted responsibility for the conditions causing the removal of the children; (2) protect her children from further sexual abuse; and (3) provide necessary understanding in support of the children. At this time, Shelly's husband, Nelson Coleman, was on trial for the sexual abuse of C.S. Shelly constantly maintained her husband's innocence. Eventually, Nelson was convicted of the crime, but this court overturned his conviction. (People v. Coleman (1990), 205 Ill. App.3d 567, 150 Ill.Dec. 883, 563 N.E.2d 1010.) At this point, the children had been removed from Shelly for one year and she had made no progress toward the return of the children. Shelly was told that this was a very serious situation and, since one year had passed without any progress, the State could file a petition to terminate her parental rights.
Between April and March 1990, a new client service plan was drawn and a case review was held. The permanency goal had been changed to "substitute care pending a court decision" because the State had decided to file a petition to terminate Shelly's parental rights. The same objectives were included in this plan and, except for the regular visitation with the children, Shelly had unsatisfactory progress on all other objectives. In October 1990, the permanency goal was still "substitute care pending a court decision" and Shelly had satisfactory progress with regard to the objective of regular visitation with the children but remained unsatisfactory in all other objectives.
Judy Sattazahn, the case review administrator for DCFS, testified as to four case reviews she participated in with Shelly. These occurred in March and October 1989, and April and October 1990. She reiterated the fact that Shelly had unsatisfactory progress for all the objectives except visitation with the children. At the October 1989 review, Shelly had unsatisfactory progress even on the visitation objective.
Several other homemakers and caseworkers from DCFS testified regarding Shelly's progress between the time the children were removed from her home and the date the petition for termination of parental rights was filed. Each person testified Shelly failed to have stable housing or to attend counseling or cooperate with the homemakers.
A bonding assessment was ordered by the court on October 3, 1991, and a report on that assessment was submitted to the court on January 7, 1992. The report recommended that the children remain together if at all possible and remain in foster care with their foster parents. The report recommended the visits between Shelly and her children cease because each child had a flat relationship with her mother and was ambivalent and agitated during visits with her mother. The bonding assessment was terminated early because the evaluator suspected misconduct by Shelly in that she had engaged in inappropriate behavior with C.S. and her grandmother.
*1349 On June 19, 1992, the court concluded the State had established by clear and convincing evidence that Shelly was an unfit parent. The court noted Shelly had failed to comply with the proper housing objectives and the budgeting plans, or cooperate with the homemaker; neither did she participate in the mental health treatment. The court commended her for the regularity of her visitation with the children but reiterated the fact that maintaining visitation alone is not enough to overcome the petition to terminate parental rights. The court concluded she had not made reasonable efforts or reasonable progress toward correcting the conditions which were the basis for the removal of the children. On June 25, 1992, after interviewing the children in chambers, the court found it overwhelmingly clear that it was in the best interests of the children to terminate Shelly's parental rights. Shelly timely filed her notice of appeal.
Shelly first contends the trial court erred by denying her request for witness fees. On October 3, 1991, the trial court ordered the bonding assessment of Shelly, the four girls, and their respective fathers. Subsequently, Shelly's mother was ordered to be included in the bonding assessment.
The bonding assessment was performed at the DCFS regional office in Charleston on December 13, 1991. Dr. Elizabeth Scott conducted the assessment and her report was submitted to the court on January 7, 1992. On February 6, 1992, Shelly requested $800 for an additional expert witness to do another bonding assessment. She alleged the first bonding assessment failed to focus on her interaction with the girls alone and also alleged that C.S. was afraid to live in the foster home because of an incident of abuse by the foster parents' adopted daughter.
The trial court heard arguments by all parties and then denied the request for witness fees for this bonding assessment. The trial court noted it was its duty to exercise discretion over the situation and that it would deny Shelly's motion.
In support of her contention, Shelly asserts, as she did at trial, "juvenile court" matters are similar to criminal matters because both types of cases involve a deprivation of liberty. Shelly attempts to equate an indigent criminal defendant, who is entitled to expert witness costs in noncapital cases where the expert testimony has been deemed crucial to a proper defense by the trial judge, to an indigent parent facing the termination of her parental rights. She contends the parent whose rights to be with the children are terminated is deprived of sharing the joy of childhood with his or her children and has lost his or her right to have any contact with the children. Shelly concludes the bias of Dr. Scott was evident in the bonding assessment report and she was denied a fair trial because of the court's failure to grant her request for expert fees for another bonding assessment.
The State contends Shelly has waived the resolution of this issue because she did not file a notice of appeal of the denial of her motion for witness fees until more than 30 days after the denial of that motion. The State alternatively suggests Shelly has waived this issue because she agreed to the use of Dr. Scott when the bonding assessment was first ordered and did not object to that procedure until one year and eight months after the first order. Finally, the State contends the trial court had no authority to appoint an expert witness and pay the fees and further contends the evidence showed Shelly had her own funds to secure the testimony of the expert witness.
In both capital and noncapital cases, the trial court may order payment for expert witnesses on behalf of indigent defendants. (Ill.Rev.Stat.1991, ch. 38, par. 113-3(d); People v. Kinion (1983), 97 Ill.2d 322, 73 Ill.Dec. 528, 454 N.E.2d 625.) Proceedings under the Juvenile Court Act of 1987 (Act) (Ill.Rev.Stat.1991, ch. 37, par. 801-1 et seq.) are civil in nature and the general rules of civil practice apply. (In re D.L. (1992), 226 Ill.App.3d 177, 187, 168 Ill.Dec. 280, 286, 589 N.E.2d 680, 686; In re J.J. (1991), 142 Ill.2d 1, 8, 153 Ill.Dec. 239, 242, 566 N.E.2d 1345, 1348.) Once there has been a finding of neglect pursuant to the Act, the proceedings by which *1350 parental rights are terminated are governed by the Adoption Act (Ill.Rev.Stat. 1991, ch. 40, par. 1501 et seq.). (In re Tolbert (1978), 62 Ill.App.3d 927, 929, 19 Ill.Dec. 64, 66, 378 N.E.2d 565, 567.) The provisions of the Civil Practice Law (Ill. Rev.Stat.1991, ch. 110, par. 2-101 et seq.) and the Code of Civil Procedure (Ill.Rev. Stat.1991, ch. 110, par. 1-101 et seq.), including all existing and future amendments and supreme court rules, apply to all adoption procedures unless otherwise specified. Ill.Rev.Stat.1991, ch. 40, par. 1524.
There is no provision in the Civil Practice Law corresponding to that in section 113-3(d) of the Code of Criminal Procedure of 1963 (Ill.Rev.Stat.1991, ch. 38, par. 113-3(d)) allowing the payment of expert witnesses on behalf of indigent defendants. The most analogous provision is found in Supreme Court Rule 215(b) (134 Ill.2d R. 215(b)), which provides for the appointment of an impartial physical or mental examination of a party whose mental or physical condition is in issue. This may be done in the court's discretion when it appears that such an examination will materially aid in the just determination of the case.
Shelly has cited no authority for her proposition that "juvenile court" matters are similar to criminal matters thus allowing the payment of expert witnesses for indigent defendants. In fact, case law supports the opposite conclusion, namely, that these matters are civil in nature and civil practice rules apply. Thus, we find this argument unpersuasive.
Even assuming the trial court had some authority to grant the motion, Shelly was not prejudiced by its denial. She made no objection to the court's order appointing Dr. Scott to perform the bonding assessment. Moreover, Shelly only objected to Dr. Scott after her report, which reflected negatively upon Shelly and her interaction with the children, was submitted to the court. She was in disagreement with Dr. Scott and wanted another assessment done to contradict Dr. Scott's assessment. Shelly alleged no ground for any possible bias or improper conduct by Dr. Scott. Finally, Shelly extensively cross-examined Dr. Scott about the report and had an opportunity to point out any defects in that report. Accordingly, there was no abuse of discretion by the trial court in denying Shelly's motion for expert witness fees.
Next, Shelly alleges the trial court erred in denying that a purported settlement agreement in Norman v. Suter (N.D.Ill.), No. 89-C-1624, is applicable here. Shelly alleges that under that settlement agreement, DCFS has to review all cases in which custody of a defendant's children was taken due to environmental neglect or inadequate food, shelter, or clothing, and offer services to find suitable housing and shelter for the children. Included in the record on appeal is the notice of a post-settlement class action lawsuit affecting families involved with DCFS who cannot meet the substance or housing needs of their children. However, Shelly has offered no support to show that this settlement agreement has in fact been reached or that Shelly is a class member of that lawsuit. She offered no evidence to suggest that DCFS was under any mandate to offer these types of services to her in this case. In any event, no settlement in Federal court between a State agency and some litigant affects the authority or jurisdiction of the circuit courts of this State to adjudicate petitions to terminate parental rights under applicable State law, nor could such a settlement affect the justiciability of the issue.
Even assuming Shelly somehow qualified for such services, Beverly Pryor, a DCFS case review administrator, testified Shelly did not qualify for such assistance because she was uncooperative with DCFS and the permanency goal was no longer "return home," but had been changed to "substitute care pending court decision." Thus, even assuming Shelly has not waived this issue, she has offered no support to show that she was in fact entitled to such services or that DCFS erred in not providing these services to her.
Finally, Shelly contends the trial court's finding that she was an unfit parent was against the manifest weight of the evidence. She alleges her daughters were *1351 removed from her because of housekeeping deficiencies yet no such reports were made after the removal. She also notes she consistently met the goal of visitation with her children.
"Unfit person" means any person whom the court shall find to be unfit to have a child without regard to the likelihood that the child will be placed for adoption, the grounds of such unfitness being any one or more of the following:
"(m) failure by a parent to make reasonable efforts to correct the conditions which were the basis for the removal of the child from such parent, or to make reasonable progress toward the return of the child to such parent within 12 months after an adjudication of neglected minor, abused minor or dependent minor under the Juvenile Court Act or the Juvenile Court Act of 1987." Ill.Rev.Stat.1991, ch. 40, par. 1501(D)(m).
A finding of unfitness may lead to the termination of parental rights and the court may take such action after finding it to be in the best interest of the minor. (In re D.L.W. (1992), 226 Ill.App.3d 805, 809, 168 Ill.Dec. 570, 573, 589 N.E.2d 970, 973.) The circuit court's finding of parental unfitness will not be set aside on review unless it is contrary to the manifest weight of the evidence. In re K.S.T. (1991), 218 Ill.App.3d 431, 435, 161 Ill.Dec. 179, 182, 578 N.E.2d 306, 309.
"`Whether a parent's efforts to correct the conditions which were the basis for removing her children are reasonable involves a subjective judgment based upon the amount of effort which is reasonable for a particular person. [Citations.] In contrast, whether a parent's progress toward return of the children within 12 months of being adjudicated neglected is reasonable involves an objective judgment based upon the amount of progress measured from the conditions existing at the time custody was taken away from the parent. [Citations.] At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification.'" (Emphasis in original.) (In re L.L.S. (1991), 218 Ill. App.3d 444, 459, 160 Ill.Dec. 804, 814, 577 N.E.2d 1375, 1385, quoting In re Allen (1988), 172 Ill.App.3d 950, 956, 123 Ill.Dec. 184, 188-89, 527 N.E.2d 647, 651-52.)
The time frame in which a parent has to make reasonable progress is not limited to the 12 months after the adjudication of neglect. Rather, the court may consider the parent's conduct during the entire post-adjudication period. (In re C.R. (1991), 221 Ill.App.3d 373, 381, 163 Ill.Dec. 779, 784, 581 N.E.2d 1202, 1207.) The 12-month period is a limiting provision which guarantees the parent a minimum of 12 months in which to improve the situation between the adjudication and a hearing on the issue of termination. In re A.T. (1990), 197 Ill. App.3d 821, 832, 144 Ill.Dec. 283, 290, 555 N.E.2d 402, 409.
The trial court's finding that Shelly was an unfit parent was not against the manifest weight of the evidence. She made no reasonable efforts to correct the conditions which were the basis of the removal of the children. The children were removed for environmental neglect and inadequate shelter. During the entire time between the filing of the petition alleging neglect through the termination of her parental rights, Shelly failed to maintain a permanent, suitable home for herself and her four children. She did not avail herself of any homemaking services in order to learn better housekeeping skills, which were in essence part of the basis for removing the children. Likewise, she made no reasonable progress toward the return of the children in the 12 months after the children were adjudicated neglected. She failed to comply with any objectives in the client service plan except the regular visitation with the children and in fact on occasion failed to comply with that objective. Shelly did not obtain suitable housing, a permanent job, attend mental health counseling or cooperate with the DCFS homemakers. In short, Shelly made no measurable or demonstrable movement toward the goal of reunification.
Therefore, the trial court's finding of unfitness was not against the manifest *1352 weight of the evidence. Accordingly, the judgment of the circuit court of Coles County is affirmed.
Affirmed.
COOK and LUND, JJ., concur.