815 N.E.2d 778 (2004)
352 Ill. App.3d 167
278 Ill.Dec. 134
In re BERNICE B., a Minor, Respondent-Appellee (The People of the State of Illinois, Petitioner-Appellee, v. Johnny D., Respondent-Appellant).
No. 1-03-1887.
Appellate Court of Illinois, First District, Sixth Division.
August 20, 2004.
*780 Bruce H. Bornstein, Chicago, for Respondent-Appellant.
Patrick T. Murphy, Cook County Public Guardian, Chicago (Charles P. Golbert and Christopher Willis, of counsel), for Minor-Respondent-Appellee.
Richard A. Devine, Cook County State's Attorney, Chicago (Renee Goldfarb, Nancy Kisicki and Colleen M. Nevin, of counsel), for Petitioner-Appellee.
Presiding Justice FROSSARD delivered the opinion of the court:
Following a parental fitness hearing, the trial court found respondent father Johnny D. unfit to parent Bernice B. based on failure to maintain a reasonable degree of interest, concern, or responsibility for Bernice's welfare, pursuant to section 1(D)(b) of the Adoption Act (Act) (750 ILCS 50/1(D)(b) (West 2000)), desertion, pursuant to section 1(D)(c) of the Act (750 ILCS 50/1(D)(c) (West 2000)), and failure to make reasonable progress towards Bernice's return home, pursuant to section 1(D)(m) of the Act (750 ILCS 50/1(D)(m) (West 2000)). Following a best interest hearing, the court terminated respondent's parental rights as to Bernice. The court also terminated the parental rights of Bernice's mother; she is not a party to the instant appeal. Respondent now appeals the termination of his right to parent Bernice, contending that due process precludes the termination of parental rights of parents who are not fit to stand trial, that evidence before the court indicated respondent was not mentally fit to "stand trial" at the time of the termination proceedings, and that the trial court's commencement of termination proceedings without first conducting a hearing to determine whether he had been "restored to fitness" violated his right to due process. The term "fitness hearing" will be used in the opinion to indicate fitness to stand trial as opposed to "parental fitness" as it relates to the first stage of a termination proceeding. Respondent *781 has not challenged the sufficiency of the evidence for the trial court's parental unfitness and best interest findings.
This is a case of first impression. We have found no Illinois case addressing a parent's due process rights to a fitness to stand trial hearing in the context of a parental rights termination case. Our analysis will focus on the narrow question presented by the factual context of this case: whether due process requires fitness to stand trial hearings for parents in termination trials who fail to cooperate with the fitness evaluation process. In resolving that question, we do not resolve the question of whether fitness hearings in termination trials should be afforded to parents who cooperate with the fitness evaluation process. We emphasize we confine our conclusion to the facts of the instant case. Where the father respondent has refused to cooperate with the fitness evaluation process, we conclude that due process does not require a fitness to stand trial hearing in the context of a parental rights termination case.

BACKGROUND
Bernice was born on July 25, 1986. She has severe developmental delays and has been diagnosed with severe to profound mental retardation. She requires assistance with virtually all aspects of daily life, including but not limited to dressing and hygiene. Bernice first came to the attention of the Department of Children and Family Services (DCFS) in 1998 through the Chicago Board of Education, which received a hotline report stating that Bernice was not toilet trained, was apparently retarded, and had not been attending school. Bernice was removed from the custody of respondent and her mother and was placed in a nonrelative, specialized foster home.
In December 1999 the trial court entered an adjudication order finding Bernice neglected based on a lack of care and an injurious environment. On June 1, 2000, following a dispositional hearing, the trial court adjudicated Bernice a ward of the court, finding her mother unable to care for her and finding respondent unable and unwilling to care for her. The trial court also entered an order requiring respondent to undergo a psychological evaluation pursuant to a "Request for Clinical Information" filed by counsel. The request stated respondent appeared "erratic in thought" and "does not appear to comprehend questions being asked of him." The request further noted that respondent had been referred for a psychological evaluation and services through DCFS but had never cooperated or complied with referrals and services previously offered.
In April 2001, the State filed a motion to terminate respondent's right to parent Bernice and to appoint a guardian with power to consent to Bernice's adoption. The State alleged the following grounds for termination: (1) failure to maintain a reasonable degree of interest, concern, or responsibility as to Bernice's welfare pursuant to section 1(D)(b) of the Act (750 ILCS 50/1(D)(b) (West 2000)); (2) desertion of Bernice for more than three months "next preceding the commencement of these termination proceedings" pursuant to section 1(D)(c) of the Act (750 ILCS 50/1(D)(c) (West 2000)); (3) failure to make reasonable efforts to correct the conditions that were the basis for Bernice's removal and/or failure to make reasonable progress towards her return pursuant to section 1(D)(m) of the Act (750 ILCS 50/1(D)(m) (West 2000)); and (4) intent to forgo parental rights based on failure to visit Bernice, communicate with the agency, and maintain contact with or plan for the future of Bernice pursuant to section *782 1(D)(n) of the Act (750 ILCS 50/1(D)(n) (West 2000)).
On June 7, 2001, approximately one year after filing its original request for clinical information regarding respondent, a second "Request for Clinical Information" was filed by counsel. The request was made in order to determine "[p]arental competence to understand and participate in judicial proceedings." Pursuant to this request, the trial court entered an order referring respondent for a clinical evaluation.
Respondent ultimately attended a psychological evaluation conducted by Ascher Levy, Psy.D., on September 26, 2001. Dr. Levy stated in the report that respondent was only "minimally cooperative" during the assessment, and "would not allow [Dr. Levy] to ask certain questions and/or would not respond to many inquiries directly." Dr. Levy opined that respondent was not able to cooperate with his attorney "whom he irrationally believe[d][was] not working in his best interest." Dr. Levy opined that respondent was unfit to participate in termination-of-parental-rights proceedings. However, Dr. Levy also concluded that respondent understood the purpose of the termination proceedings as well as the roles of the judge and respondent's counsel in those proceedings.
As a result of respondent's failure to cooperate, Dr. Levy was only able to obtain a minimal assessment and could not determine whether respondent suffered from a treatable mental illness. Respondent's lack of cooperation also prevented Dr. Levy from forming an opinion as to whether respondent "can be restored to fitness to participate in these proceedings within a reasonable period of time." Dr. Levy recommended that a psychiatrist evaluate respondent to determine if his "irrational beliefs" and "disruption of court" were the result of a treatable mental illness or "characterological traits that are unlikely to change" and to determine whether psychotropic medication could restore him to fitness.
On October 17, 2001, a third "Request for Clinical Information" was filed. It sought a psychiatric evaluation of respondent to determine a mental health diagnosis and whether psychiatric medication could restore him to fitness. Pursuant to that request, the trial court entered an order referring respondent for a psychiatric assessment. In December 2001, the trial court held a brief hearing regarding the status of respondent's psychiatric examination. After noting it had received a letter from the Clinical Evaluation and Services Initiative indicating respondent had missed the examination, the trial court indicated it would not further postpone the termination proceedings to "get [respondent] to go to his psychiatric exam."
Respondent had three different attorneys over the course of five years during the instant case. The trial court first appointed the office of the public defender to represent respondent in May 1998. In October 1998, approximately five months after its appointment, the public defender filed a motion to withdraw. The motion noted that respondent informed an assistant public defender in August 1998 that he wanted a "real lawyer" and was dissatisfied with the services of the public defender's office. The motion further noted that on October 13, 1998, respondent informed an assistant public defender that he would not cooperate with any services or court orders, and that he had filed a suit against the public defender's office. In December 1998, the trial court granted the public defender's motion to withdraw.
In March 2001, the trial court ordered that private counsel be appointed for respondent. Kimberly Seymore, the appointed counsel, represented respondent *783 for approximately seven months before filing a motion to withdraw in November 2001. Ms. Seymore's motion noted respondent had stated on numerous occasions he wanted to fire her and cited Dr. Levy's psychological report, which stated respondent irrationally believed his attorney was not working in his best interest. The motion also noted respondent had filed a complaint against her with the Attorney Registration and Disciplinary Commission.
At a December 2001 hearing, Ms. Seymore advised the trial court of her motion to withdraw. The trial court stated, "[b]ased upon your client's apparent mental condition, I'm probably not going to allow you to withdraw." The court further noted as follows:
"The problem is that [respondent] can defeat this entire case if every time I appoint a lawyer for him, he files a complaint with the ARDC. I don't intend to allow him to do that. We're dealing with a man who has been found to not even be competent to stand trial."
Ms. Seymore subsequently filed another motion to withdraw based on her acceptance of employment with the circuit court of Cook County. Thereafter, the trial court appointed James Williams as counsel for respondent.
At the outset of the parental fitness hearing conducted on January 15, 2003, Mr. Williams orally moved to withdraw as counsel for respondent. Mr Williams advised the trial court that respondent suggested he was mishandling the case. The court responded as follows:
"[Respondent] and his wife have been almost masters of delaying this matter. They don't cooperate with attorneys, they don't cooperate when I order them to do things. * * * I dare say, if I were to allow you to withdraw and a new lawyer to come in, I suspect that at the time that that matter is set for trial, [respondent] will do the same thing. He will come in here and complain about that lawyer's representation so that again, hopefully, the matter will be continued. * * * [T]he Court has now observed [respondent and his wife] for two years with this pattern of non-appearance and then * * * [respondent] complains and [he] gets a new lawyer."
The court then ordered the parties to proceed with the parental fitness hearing and did not permit Mr. Williams to withdraw.
At the parental fitness hearing, Charles Taylor, who had been Bernice's caseworker since June 2000, testified that during the summer of 2000 he scheduled a visit between respondent and Bernice. Respondent did not show up for the visit. Mr. Taylor scheduled another visit for May 24, 2001, but respondent canceled the visit because of car trouble. Mr. Taylor could not recall any other occasion when respondent requested a visit with Bernice.
Mr. Taylor stated respondent did not appear for his first psychological appointment, scheduled in November 2000. Mr. Taylor scheduled a second appointment for later that month and informed respondent of that appointment through letters. Respondent did not attend that appointment and never completed a psychological evaluation while Mr. Taylor was his caseworker. Mr. Taylor also recommended that respondent take a class for parents of children with special medical needs. Respondent never took such a class. Respondent tested positive for cannabis in December 2000. Mr. Taylor rated respondent unsatisfactory for services in November 2000 and May 2001 service plans. The basis for the May 2001 unsatisfactory rating was that his whereabouts were unknown and he had no contact with the agency. On cross-examination, Mr. Taylor stated respondent visited Bernice twice since he had been assigned *784 the case, and that these visits were appropriate.
Respondent testified that he wanted to have Bernice returned to his care and stated he had not done anything to harm his daughter. When asked what he had done to get Bernice back, respondent answered that there was "nothing a parent can do without the help of the worker," and that Mr. Taylor was not willing to help him. Following counsel's direct examination of respondent, the trial court asked respondent, "Do you recall what year it was that you last saw your daughter?" Respondent answered, "2000. I think it was closer to 2002."
The trial court found respondent unfit based on desertion, his failure to maintain a reasonable degree of interest, concern, or responsibility for Bernice's welfare, and his failure to make reasonable progress toward Bernice's return home pursuant to sections 1(D)(b),(c), and (m) of the Act (750 ILCS 50/1(D)(b),(c), and (m) (West 2000)). In support of its findings, the trial court noted that "[respondent's] complaints about Mr. Taylor lack credibility. There's no reason to believe that Mr. Taylor was doing anything but trying to help [respondent]." In addition, the court noted "[respondent's] testimony was, as it was obvious here on the stand, at times incoherent and at many times wandered from the point that was being pursued both by his attorney and as a matter of fact by this Court."
At the best interest hearing, Angela Blalock, Bernice's current caseworker, testified that Bernice's foster mother of almost five years was willing to adopt Bernice and was committed to caring for Bernice beyond her twenty-first birthday. Bernice was attending a school for developmentally delayed children. The foster mother had completed special training to care for Bernice. Ms. Blalock opined that the foster mother took very good care of Bernice, there was a closeness between them, and it was in Bernice's best interest to be adopted by her foster mother. According to Ms. Blalock, Bernice would always need someone to take care of her.
Respondent testified that he had Bernice evaluated by a doctor and that at the age of three Bernice was mentally at a one-year-old level. He stated Bernice used sign language to communicate with him and was bonded to him. He testified Bernice taught herself to play video games by watching her brothers. During his testimony, the court admonished him to focus on his answers.
Respondent further testified that Bernice was bonded to her brothers. He stated he tried to visit Bernice but had problems arranging visits with the social service agency in question. Respondent stated he tried to communicate with Bernice, including through her writing and scribbling. He said he was trying to get her to communicate so that she "won't be handicap, so she will be independent for her life." He thought he was a good parent and did not want his parental rights terminated.
The trial court found by a preponderance of the evidence that Bernice is a special needs minor who is profoundly developmentally delayed. While the trial court noted there is no doubt respondent loves Bernice, it also stated as follows:
"[I]t is clear that there is at least some dysfunction in the home of [respondent], perhaps through no fault of his wife or his own, but it is clear to this Court based upon everything that's been presented, not only here today but in previous hearings, that [respondent] unfortunately cannot provide adequate care for this minor and he is not capable of providing the special needs that this minor needs."
*785 Accordingly, the trial court found that termination of respondent's parental rights was in the best interest of Bernice.

ANALYSIS
Respondent contends on appeal that due process "requires that only fit parents be allowed to proceed to trial." Respondent reasons that "[a] parent found to be unfit due to inability to assist in his own defense cannot meaningfully reap the benefit of being represented by counsel, presenting evidence and being heard, and cross-examining witnesses." Respondent argues that Dr. Levy's psychological report as well as his own erratic behavior during the parental fitness and best interest hearings showed that he was not mentally fit to participate in the termination proceedings, and that the trial court therefore violated his right to due process by conducting those proceedings without first conducting a hearing to determine whether he was "restored to fitness." Respondent specifically argues that "[t]he trial should not have commenced until the court made a determination that respondent was restored to fitness."
We apply de novo review to the question of whether termination of respondent's parental rights without a hearing to determine respondent's fitness to stand trial violated due process. See People v. Hall, 198 Ill.2d 173, 177, 260 Ill.Dec. 198, 760 N.E.2d 971 (2001) (applying de novo review to question of whether defendant's due process rights were violated when trial court accepted his admission to probation violations without admonishing him of his right to a probation revocation hearing at which he could confront adverse witnesses).
"The due process clause of the fourteenth amendment to the United States Constitution provides that no state shall `deprive any person of life, liberty, or property, without due process of law.'" In re D.T., 338 Ill.App.3d 133, 151, 272 Ill.Dec. 829, 788 N.E.2d 133 (2003), quoting U.S. Const., amend. XIV, § 1. "The fundamental requirement of due process is the opportunity to be heard `at a meaningful time and in a meaningful manner.'" Mathews v. Eldridge, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18, 32 (1976), quoting Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62, 66 (1965). Due process "'is not a technical conception with a fixed content unrelated to time, place and circumstances.'" Mathews, 424 U.S. at 334, 96 S.Ct. at 902, 47 L.Ed.2d at 33, quoting Cafeteria & Restaurant Workers Union Local 473 v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230, 1236 (1961). Rather, "due process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484, 494 (1972). Due process requires fundamental fairness, and a court must consider the specific facts of each particular situation in assessing the competing interests. Lassiter v. Dep't of Social Services, 452 U.S. 18, 24-25, 101 S.Ct. 2153, 2158, 68 L.Ed.2d 640, 648 (1981).
Respondent argues that "[t]he same analysis and constitutional protections that require a defendant to be fit for trial in a criminal case also require that a parent be fit for trial in a termination of parental rights case." In support of that argument respondent relies on criminal cases involving unfit defendants.
The Illinois Code of Criminal Procedure requires that a defendant in a criminal case be given a fitness to stand trial hearing when a bona fide doubt exists as to his fitness. 725 ILCS 5/104-11,16 (West 2000). The purpose of the hearing is to determine if the defendant is unfit to *786 stand trial or plead and, if so, whether there is a substantial probability that treatment will return him to fitness within one year. 725 ILCS 5/104-16(d) (West 2000). In determining whether criminal procedural protections should be applied to civil proceedings, courts should consider whether the statute is punitive in nature and if not, criminal protections would usually not apply. See United States v. Ursery, 518 U.S. 267, 288, 116 S.Ct. 2135, 2147, 135 L.Ed.2d 549, 568 (1996). The Juvenile Court Act, as it relates to parental rights, is not punitive but civil in nature. Indeed, "[e]xcept in delinquency proceedings when a minor's liberty is at stake, proceedings under the [Juvenile Court Act] [citation] employ the general rules of civil practice and the provisions of the Code of Civil Procedure [citation] unless the Juvenile Court Act specifically governs the procedure at issue." In re A.B., 308 Ill.App.3d 227, 234, 241 Ill.Dec. 487, 719 N.E.2d 348 (1999). Thus, criminal procedure is not necessarily instructive in the context of the issue raised by the instant case. See In re A.B., 308 Ill.App.3d at 234-35, 241 Ill.Dec. 487, 719 N.E.2d 348 (concluding that trial court improperly applied provision of Code of Criminal Procedure to question of whether business records were admissible at parental fitness hearing); In re E.S., 246 Ill.App.3d 330, 335-36, 186 Ill.Dec. 289, 615 N.E.2d 1346 (1993) (rejecting parent's argument that "juvenile court" matters are analogous to criminal matters and thus concluding that trial court properly denied parent's request for expert witness fees); but see In re M.H., 313 Ill.App.3d 205, 212-14, 246 Ill.Dec. 86, 729 N.E.2d 86 (2000) (disagreeing that proceedings to terminate parental rights are not analogous to criminal proceedings in the context of respondent's admission regarding parental fitness which, like a guilty plea, requires a sufficient factual basis).
"Both the United States Supreme Court and the Illinois Supreme Court have recognized the fundamental liberty interest natural parents have in the care, custody, and control of their children." In re D.T., 338 Ill.App.3d at 151, 272 Ill.Dec. 829, 788 N.E.2d 133. "[P]arental rights termination proceedings interfere with this fundamental liberty interest and, therefore, must meet the requirements of the due process clause." In re D.T., 338 Ill.App.3d at 151, 272 Ill.Dec. 829, 788 N.E.2d 133. "In determining whether the procedures followed in a parental rights termination proceeding satisfied the constitutional requirements of due process, this court must balance three factors." In re M.R., 316 Ill.App.3d 399, 402, 249 Ill.Dec. 325, 736 N.E.2d 167 (2000), citing Mathews, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18. "The factors outlined in Mathews are: (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of that interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." In re M.R., 316 Ill.App.3d at 402, 249 Ill.Dec. 325, 736 N.E.2d 167, citing Mathews, 424 U.S. at 334-35, 96 S.Ct. at 902-03, 47 L.Ed.2d at 33.
In the instant case, the first Mathews factor requires us to consider two separate private interests. First, the parent has an interest in the custody, care, and control of his child and in maintaining a parental relationship with her. In re D.T., 338 Ill.App.3d at 152, 272 Ill.Dec. 829, 788 N.E.2d 133. "[T]his interest is fundamental and will not be terminated *787 lightly." In re M.H., 196 Ill.2d 356, 365, 256 Ill.Dec. 297, 751 N.E.2d 1134 (2001). Second, "the child has an important interest in a loving, stable and safe home environment, which may not involve any relationship with her natural parent." In re D.T., 338 Ill.App.3d at 152, 272 Ill.Dec. 829, 788 N.E.2d 133. "While she has a stake in preserving some kind of relationship with her natural parent, she may also have an interest in maintaining a relationship with her foster parents." In re D.T., 338 Ill.App.3d at 152, 272 Ill.Dec. 829, 788 N.E.2d 133.
The evidence presented indicates Bernice does have a significant interest in maintaining the relationship with her foster mother. Bernice has lived with her foster mother for over five years and depended upon her foster mother for her special needs. Bernice will need special care for the rest of her life; the record does not reflect that respondent has provided or will soon be able to provide that care. We further recognize that a child has an interest in terminating State custody. A state ward, for example, cannot travel out of state, receive health care, or engage in religious instruction until the child welfare agency responsible for overseeing her care obtains written consent from the child's parent, guardian, or other legal custodian. 89 Ill. Adm.Code § 401.410 (2001).
The second Mathews factor requires us to consider to what extent, if any, the absence of a fitness hearing increased the risk that respondent's rights were erroneously terminated, and to consider the probable value, if any, of additional or substitute procedural safeguards. As previously noted, respondent does not challenge the sufficiency of the trial court's evidence for its parental unfitness and best interest findings. In fact, respondent does not suggest what evidence he would have presented or how he could have better assisted his attorney had he been formally found mentally fit to participate in the termination proceedings. In short, respondent identifies no evidence and presents no argument indicating that the outcome of the termination proceedings would have been any different had the court waited to commence those proceedings until he was "restored to fitness." The procedures used by the trial court properly safeguarded respondent's rights. The risk of error to respondent was minimal because he was effectively represented by counsel, he testified on his own behalf, and he provided exhibits which were admitted into evidence and considered by the trial court. Accordingly, based on the record we conclude the absence of a fitness hearing offered little or no risk that respondent's rights were erroneously terminated.
In the instant case, the fitness hearing requested by respondent could potentially have served to provide additional evidence weighing in favor of termination of his right to parent Bernice. The determination of whether termination of parental rights is in a child's best interest requires the trial court to consider several statutory factors, including the child's physical safety and welfare and the child's need for stability and continuity with parent figures. In re D.T., 338 Ill.App.3d at 145-46, 272 Ill.Dec. 829, 788 N.E.2d 133; 705 ILCS 405/1-3(4.05)(a), (g) (West 2000). A finding that respondent was not mentally fit could constitute evidence related to these factors and weigh in favor of termination. Finally, we note that by not cooperating with support services prior to the termination proceedings, respondent failed to avail himself of mental health services which were available. Respondent had an opportunity to attend a psychiatric evaluation for diagnostic purposes and assessment of whether psychotropic medication *788 would help restore mental fitness; he did not attend. Respondent argues his due process rights were violated by the trial court's failure to conduct a fitness to stand trial hearing. However, respondent refused to attend his psychiatric appointment to determine if he could be restored to fitness.
The third Mathews factor requires us to consider the governmental interests involved in the termination of parental rights proceeding, including the function of the proceeding in question and the fiscal and administrative burdens that requiring a fitness hearing would place on the government. The State has a parens patriae interest in preserving and promoting the welfare of the child. In re D.T., 338 Ill.App.3d at 153, 272 Ill.Dec. 829, 788 N.E.2d 133. Neither the postponement of termination proceedings until a fitness to stand trial hearing could be conducted nor the indefinite postponement of the termination proceedings until respondent could be restored to fitness would further the State's interest in preserving and promoting Bernice's welfare. Instead, such postponements would further delay Bernice's interest in finding a permanent home.
In addition, precluding termination of parental rights until the parent in question has been determined mentally fit would impose increased fiscal costs and administrative burdens on the State. The State could be required to expend legal resources to establish the fitness of the parent in question and to pay for the treatment to restore the parent to fitness. In order to establish such fitness, the State could be required indefinitely to pay psychiatrists or other mental health professionals to examine, treat and report on the subject parent. The process could take months or years, or go on indefinitely, adding to the fiscal costs and administrative burdens.
In the instant case, respondent had a history of not cooperating with referrals for psychological evaluation, psychological services, and medication assessment. Examination, evaluation, and assessment could go on indefinitely, particularly if as in the instant case, the parent refused to be examined or refused to cooperate. Such delay would defeat the child's fundamental right to a stable nurturing home. See In re D.F., 208 Ill.2d 223, 231, 280 Ill.Dec. 549, 802 N.E.2d 800 (2003), quoting 705 ILCS 405/2-14(a) (West 2000) ("`[t]he legislature recognizes that serious delay in the adjudication of abuse, neglect, or dependency cases can cause grave harm to the minor'"). The child would stay in the pre-adoptive home, but not gain the benefits of permanency provided by adoption. See In re D.F., 208 Ill.2d at 231, 280 Ill.Dec. 549, 802 N.E.2d 800 (noting that "[a] stated purpose of the Juvenile Court Act is to secure permanency for minors who have been removed from the custody of their parents `at the earliest opportunity'"). The State would be required to continue to pay for foster care during this indefinite period of delay. The State's interest in the child's well-being would be undermined by requiring fitness hearings in termination trials where a parent-respondent refused to cooperate with the fitness evaluation and restoration process. Based upon our consideration of the Mathews factors in light of the facts and circumstances of this case, we conclude that the absence of a fitness hearing did not violate respondent's right to due process.
Respondent cites two delinquency cases and a criminal case to support his contention that the dictates of due process required the trial court to conduct a fitness for trial hearing: In re T.D.W., 109 Ill.App.3d 852, 65 Ill.Dec. 363, 441 N.E.2d 155 (1982), In re E.V., 190 Ill.App.3d 1079, 138 Ill.Dec. 354, 547 N.E.2d 521 (1989), *789 and People v. Sandham, 174 Ill.2d 379, 220 Ill.Dec. 611, 673 N.E.2d 1032 (1996). Respondent's reliance on those cases is misplaced as the minors in the delinquency cases and the defendant in the criminal case were all taken into custody by the state following proceedings which were punitive in nature. In re T.D.W., 109 Ill.App.3d at 854, 65 Ill.Dec. 363, 441 N.E.2d 155; In re E.V., 190 Ill.App.3d at 1080, 138 Ill.Dec. 354, 547 N.E.2d 521; Sandham, 174 Ill.2d at 381, 220 Ill.Dec. 611, 673 N.E.2d 1032. In contrast, in the instant case, respondent was not taken into custody following a proceeding which was punitive in nature. In short, while the proceeding in the instant case involved respondent's liberty interest in the care, custody, and control of Bernice, it did not directly affect the type of liberty interest in being free from State custody which was at issue in the proceedings in the cases cited by respondent.

CONCLUSION
As we noted earlier in this decision, the specific requirements of due process are not fixed but, rather, require consideration of the facts and circumstances of the case in question. In the factual context of the instant case, respondent received a psychological evaluation finding him unfit because he failed to cooperate with his attorney. However, after that finding, he refused to cooperate with a follow-up psychiatric appointment for a diagnostic assessment and determination of whether he needed psychotropic medication to restore him to fitness. We cannot conclude under the Mathews balancing test that due process required the trial court to hold a hearing to determine respondent's fitness to stand trial in the instant parental rights termination case where respondent refused to cooperate with the fitness evaluation process. Under the Mathews balancing test, we reject respondent's argument that "the trial should not have commenced until the court made a determination that respondent was restored to fitness."
We recognize that different circumstances could potentially warrant a fitness to stand trial hearing prior to the commencement of proceedings to terminate parental rights. Such circumstances, however, were not present in the case before us. As previously noted, we do not resolve the question of whether parents who cooperate with the fitness evaluation process should be afforded fitness hearings in termination trials. Rather, we limit our holding to the question presented by the factual context of this case. For the reasons previously discussed, we conclude due process does not require fitness to stand trial hearings for parents in termination trials who have refused to cooperate with the fitness evaluation process. Accordingly, we affirm the judgment of the trial court.
Affirmed.
TULLY and GALLAGHER, JJ., concur.