NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 230608-U

NO. 4-23-0608

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 14, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* J.M., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Peoria County |
|      Petitioner-Appellee, | ) | No. 22JA205 |
|      v. | ) | |
| Sonja C., | ) | Honorable |
|      Respondent-Appellant). | ) | Derek G. Asbury, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE DeARMOND delivered the judgment of the court.
Justices Cavanagh and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, finding (1) respondent's counsel was not ineffective and (2) the circuit court did not err by failing to order a mental health examination.

¶ 2    Respondent, Sonja C., appeals the circuit court's orders finding her daughter, J.M. (born May 2016), a neglected minor and finding her unfit and unable to care for J.M. We affirm.

¶ 3    I. BACKGROUND

¶ 4    A. Neglect Petition

¶ 5    On November 3, 2022, the State filed a petition pursuant to the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2022)), alleging J.M. was neglected by respondent because J.M. was in an environment injurious to her welfare. Specifically, the petition alleged, "The mother experiences delusions which cause her to behave erratically, sometimes in the presence of the minor." The petition alleged several incidents of delusional or erratic behavior.

The petition also alleged J.M. was "beginning to internalize some of the mother's delusions." The petition noted J.M. was previously made a ward of the court in Peoria County case No. 17-JA-37, which was successfully closed in December 2018. (We note the State also alleged J.M.'s father had a lengthy criminal history. He stipulated to the petition, and he is not party to this appeal.)

¶ 6                                    B. March 2, 2023, Hearing

¶ 7            At a March 2, 2023, hearing, respondent's counsel, assistant public defender Dana Kelly informed the circuit court respondent indicated she did not want Kelly to represent her any longer. Respondent informed the court Kelly told her she could only see J.M. if she signed forms for J.M. to be an organ donor. Kelly denied making this statement. The court agreed to discharge Kelly and assign Adam Bowton as respondent's counsel. However, respondent stated she was not comfortable with Bowton's name, although she did not know him. The court appointed Bowton pending respondent retaining private counsel and continued the matter. (Respondent did not retain private counsel.)

¶ 8                                    C. Adjudicatory Hearing

¶ 9            At the adjudicatory hearing, Bowton informed the circuit court respondent wished to hire a different attorney or represent herself. Respondent complained the judge was not present the last time she was in court, although the same judge presided over both hearings. The court explained the process to respondent, and her request for a continuance to obtain a new attorney was denied. The court proceeded to the adjudicatory hearing. The record on appeal reflects throughout the proceedings, the court repeatedly admonished respondent to not interrupt.

¶ 10           Ashley Morgan, an investigator for the Illinois Department of Children and Family Services (DCFS), testified she called respondent on the morning of June 28, 2022, as part

of an investigation. Respondent reported she was at a homeless shelter in Bloomington, Illinois, because she did not feel safe in Peoria. According to respondent, (1) J.M. had said her father was poisoning their food and water, (2) J.M.'s father was involved in insurance fraud, (3) she was part of the federal government and had several contacts within the federal government, including a general, and (4) she reported "to the supreme court, the governor, and the general" J.M.'s father was poisoning their food. Morgan met respondent at the shelter and suggested she get mental health and medical assessments at the hospital. Respondent stated the Bloomington hospitals were part of a lawsuit she was involved in, and she did not feel safe at those hospitals. Morgan met with J.M., who stated her father was deaf and her mother told her he was evil. Morgan explained respondent went to Carle BroMenn Medical Center (BroMenn) with J.M. Morgan never obtained a mental health evaluation from BroMenn.

¶ 11         Peoria County Sherriff's Deputy Nicholas Norwood testified he responded to a call at respondent's residence. Norwood identified respondent, and respondent interjected she had "never seen this man before ever in [her] life." Norwood explained respondent spoke to him through a window before eventually exiting the residence. She reported someone had attempted to cut a tire off her vehicle. Norwood noted a lug nut was missing from the tire, but it would have been very difficult for someone to cut off. Respondent told Norwood J.M. reported her father worked with "men in wigs" to pour liquid from a bottle with skulls and crossbones on it onto respondent's face while she slept. She believed J.M.'s father and a "gang of stalkers" were attempting to kill her. Respondent showed Norwood a video of a sedan stopping at a stop sign outside her residence before continuing on.

¶ 12         Peoria County Sherriff's Deputy Jacob Marion testified he responded to a call at respondent's residence. Respondent called multiple times, reporting on the third call someone

was knocking on her back door and trying to open the door. During the prior calls, officers were unable to locate anyone in the vicinity. Respondent refused to speak to the officers when they arrived the third time.

¶ 13 Mary McCartney-Hay, an investigator for DCFS, testified she spoke with respondent at her residence. Respondent initially refused to meet with McCartney-Hay, but after her supervisor and a police officer arrived, respondent agreed to speak with McCartney-Hay. Respondent reported she was being watched and was part of a Federal Bureau of Investigation (FBI) investigation. Respondent showed McCartney-Hay a video, which she said showed her being followed home. The video was of respondent's steering wheel.

¶ 14 The circuit court admitted respondent's certified medical records from BroMenn and SIH Hospital of Carbondale (SIH Hospital) without objection.

¶ 15 The BroMenn records described the chief complaint for respondent's visit to be a "Psych Evaluation" and described respondent as "very paranoid, unable to stay on one topic and unable to focus." The records noted respondent "did not want to stay for Crisis evaluation" and was informed she could sign out against medical advice. Respondent refused to sign out and did not leave. Employees contacted the DCFS hotline but were told DCFS could not help since respondent was not detainable. The record reported respondent was using the restroom with the door open, stating, " 'I hope the world can see me. You're welcome world. How f*** up is this? Making me pee with the door open?' " Respondent was informed the door could close and was encouraged to close the door. She began yelling, " 'SEE WORLD!? ANOTHER CASE FOR THE FBI. TAKING THIS RIGHT FROM ME TOO! PEEING WITH THE DOOR OPEN LIKE THE TRASH THEY THINK I AM!' " Respondent spoke with a crisis counselor but declined a mental health evaluation. Respondent was discharged and waited for a ride from Uber. When the

- 4 -

vehicle arrived, respondent "ran back inside yelling 'that is not an uber! Call the police!' " The driver showed employees his Uber app with a ride request from respondent. Respondent insisted the driver was not with Uber because there was no neon Uber sign in the windshield. Respondent "ran off on foot with her child."

¶ 16 The SIH Hospital record reported respondent arrived with a complaint of chest pain. She also reported she had "bladder, kidney and brain stem cancer," which she could not get treatment for, and discussed her "supreme court case" over lack of care and several federal investigations. The treating physician noted respondent "state[d] frequently that she will be suing me and that I will also be part of the federal investigation." A nurse contacted DCFS to request a well-child check. Respondent recorded hospital employees with her phone. The record noted there was evidence respondent had abdominal cancer. Respondent walked out of the emergency room without being discharged.

¶ 17 Respondent testified. She denied reporting to the investigator J.M. stated her father was poisoning food or she reported the supposed poisoning to anyone. She denied reporting anyone was trying to kill her. Respondent stated a police officer told her someone cut the lug nut off her car, but she took the car to a shop, and they said nothing was wrong with the car. She denied reporting "men with wigs" poured something on her in her sleep, though she said J.M. mentioned her father brought home women who were wearing wigs. Respondent also stated she did not call the police repeatedly and it was her neighbor who reported someone at respondent's back door with a gun. Respondent called the police to see "what was going on" and dispatch informed her there had been robberies in the neighborhood. She refused to leave the house because it was the middle of the night. Respondent went to BroMenn because she was told she could not stay at the homeless shelter while having chest pains without being seen at the

hospital. She denied telling anyone at the hospital she was with the FBI and had an ongoing supreme court case. Respondent stated no one asked for a mental health assessment. She denied telling J.M. her father was evil or dead. Respondent also denied being homicidal, suicidal, or depressed.

¶ 18 As the circuit court reviewed the evidence, respondent again interrupted,

"RESPONDENT MOTHER: I never denied that—

THE COURT: Ma'am, you have got to stop.

RESPONDENT MOTHER: But you are not going to put words in my mouth, and I'm not going to not say anything.

THE COURT: If you talk over me, I'm going to have to remove you.

RESPODNENT MOTHER: You always—

THE COURT: I don't want to remove you. So, please, stop. Let me finish the ruling. You have a right to appeal, and I will get to that at the end."

The court determined "all these independent witnesses credible and their statements almost identical as it relates to what she told them what—how she behaved, weighed against her just saying in court, no, I didn't say that or do that." The court found the petition proven in its entirety by a preponderance of the evidence and J.M. neglected due to an injurious environment.

¶ 19 After a discussion on visitation, respondent addressed the circuit court:

"RESPONDENT MOTHER: Can I ask one question? When did you get your psychiatrist license?

THE COURT: Don't have one.

RESPONDENT MOTHER: I didn't think you did. So you have no right to call me paranoid and delusional.

THE COURT: I'm not calling you that.

RESPONDENT MOTHER: You did.

THE COURT: What I'm saying is the evidence presented—

RESPONDENT MOTHER: There was a sergeant that told me and my husband, and you did not even ask my husband, that there was a federal case going on.

THE COURT: Ma'am, calm down. I don't want you to get arrested.

RESPONDENT MOTHER: I'm not getting arrested—

THE COURT: For the record, she is getting visibly upset.

RESPONDENT MOTHER: —because you guys have a lawsuit coming.

THE COURT: And I'm trying to prevent that from happening. So the Court has entertained her to an extent allowing her to ask questions I normally don't because I want to be as fair as possible here.

RESPONDENT MOTHER: Well, you're not.

THE COURT: But, again, she is making that difficult. She is starting to get disrespectful. So I'm going to ask you to stop doing that, please."

¶ 20                                  D. Dispositional Order

¶ 21        After a hearing, the circuit court entered a written order finding respondent unfit, for reasons other than financial circumstances alone, to care for, protect, train, or discipline J.M. The court made J.M. a ward of the court and placed her guardianship with the guardianship administrator of DCFS.

¶ 22        This appeal followed.

¶ 23                                  II. ANALYSIS

¶ 24       We initially comment on the delay in the issuance of this order. As a matter addressing the custody of minor children, this case is subject to expedited disposition under Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018), requiring the appellate court to issue its decision within 150 days after the filing of a notice of appeal, except for good cause shown. Respondent filed her initial notice of appeal on June 29, 2023. Although every effort was made to comply with the deadline under Rule 311(a)(5), due to delays occasioned by respondent's counsel, we find good cause for issuing our decision after the 150-day deadline.

¶ 25       On appeal, respondent argues (1) she received ineffective assistance of counsel where her counsel failed to request a mental health examination prior to the adjudicatory hearing and (2) the circuit court erred by failing to *sua sponte* order a mental health examination.

¶ 26                              A. Ineffective Assistance of Counsel

¶ 27       Section 1-5(1) of the Act provides minors and their parents "the right to be present, to be heard, to present evidence material to the proceedings, to cross-examine witnesses, to examine pertinent court files and records and *** the right to be represented by counsel." 705 ILCS 405/1-5(1) (West 2022). "While the right to counsel in juvenile proceedings is statutory and not constitutional, Illinois courts apply the standard utilized in criminal cases to gauge the effectiveness of counsel in juvenile proceedings." (Internal quotation marks omitted.) *In re Ch. W.*, 399 Ill. App. 3d 825, 828, 927 N.E.2d 872, 875 (2010). A parent's claim of ineffective assistance of counsel is therefore analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Ch. W.*, 399 Ill. App. 3d at 828. "To prevail on such a claim, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant." (Internal quotation marks omitted.) *People v. Thomas*, 2017 IL App (4th) 150815, ¶ 10, 93 N.E.3d 664. To establish deficient performance, the

respondent must demonstrate counsel's performance "fell below an objective standard of reasonableness." *Thomas*, 2017 IL App (4th) 150815, ¶ 10. To establish prejudice, the respondent must show that, "but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different." (Internal quotation marks omitted.) *Thomas*, 2017 IL App (4th) 150815, ¶ 11. "Failure to satisfy either prong negates a claim of ineffective assistance of counsel." *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 88, 129 N.E.3d 755.

¶ 28      In this case, respondent argues counsel's performance was deficient for failing to file a motion for a mental health examination with the circuit court. However, respondent has failed to demonstrate how she was prejudiced by the lack of a mental health examination. Respondent points out "it is hard to imagine how things could have gone worse for the Respondent." However, the standard for prejudice is not whether the proceedings could have gone "better" for respondent but whether there is a *reasonable probability* the *result* of the proceedings would have been different. See *Thomas*, 2017 IL App (4th) 150815, ¶ 11. The record on appeal demonstrates clearly the State presented ample evidence of incidents during which respondent behaved erratically, sometimes in the presence of J.M., and J.M. was internalizing respondent's delusions. Respondent has failed to explain how a mental health examination would have changed the outcome of the proceedings. She has not identified any additional evidence which could have been introduced, explained how she could have better assisted her attorney, or explained how the outcome would have been different if a mental health examination had been conducted. The record clearly showed respondent's mental health condition and the records submitted supported what was obvious to the court and everyone present. An evaluation would have served no useful purpose, even if she agreed to cooperate

with one—something which was not a given in light of respondent's previous refusal to do so. "Satisfying the prejudice prong necessitates a showing of actual prejudice, not simply speculation that defendant may have been prejudiced." *People v. Patterson*, 2014 IL 115102, ¶ 81, 25 N.E.3d 526. Respondent's speculation the proceedings could have gone "better" is insufficient to demonstrate prejudice under *Strickland*. Thus, as respondent cannot demonstrate she was prejudiced by counsel failing to file a motion for a mental health examination, her claim of ineffective assistance of counsel fails. See *Hibbler*, 2019 IL App (4th) 160897, ¶ 88.

¶ 29                                    B. *Sua Sponte* Mental Health Evaluation

¶ 30            Respondent next argues the circuit court erred by not *sua sponte* ordering a mental health evaluation to determine respondent's fitness to stand trial. Respondent argues her in-court behavior made it evident she was unable to effectively participate in the proceedings.

¶ 31            Respondent provides no authority which indicates the circuit court was required to *sua sponte* order a mental health evaluation. In fact, as the Third District recognized, "there is no statute or court rule requiring the trial court to order a mental examination before conducting an adjudicatory hearing and that in most cases the absence of such a rule is fully warranted." *In re C.S.*, 376 Ill. App. 3d 114, 119-20, 878 N.E.2d 110, 114 (2007).

¶ 32            Although proceedings under the Act are in some ways analogous to criminal proceedings (see *In re M.H.*, 313 Ill. App. 3d 205, 214, 729 N.E.2d 86, 94 (2000) ( "[A]n admission of unfitness is clearly analogous to a guilty plea in a criminal case.")), "[p]roceedings under the Act are not criminal." *In re W.C.*, 167 Ill. 2d 307, 320, 657 N.E.2d 908, 915 (1995); see also *In re Bernice B.*, 352 Ill. App. 3d 167, 175, 815 N.E.2d 778, 786 (2004) ("The [ Act], as it relates to parental rights, is not punitive but civil in nature."). Illinois courts have rejected a due process right to a mental fitness examination akin to criminal cases in the context of proceedings

under the Act. See *In re Charles A.*, 367 Ill. App. 3d 800, 805, 856 N.E.2d 569, 769 (2006) (finding a respondent was not denied due process by the denial of a motion for a fitness hearing prior to termination proceedings); see also *In re N.T.*, 2015 IL App (1st) 142391, ¶ 58, 31 N.E.3d 254 (finding the circuit court's failure to *sua sponte* order a fitness examination prior to termination proceedings did not deny respondent mother due process).

¶ 33 In *C.S.*, the Third District determined the circuit court erred by denying the respondent mother's motions for a mental health examination prior to an adjudicatory hearing. *C.S.*, 376 Ill. App. 3d at 120. The State's petition alleged the minor was in an environment injurious to her welfare and was a dependent minor due to the respondent mother's prior diagnoses of mental illness. *C.S.*, 376 Ill. App. 3d at 115. The respondent mother's counsel twice moved for a mental health examination prior to the adjudicatory hearing, which the court denied. *C.S.*, 376 Ill. App. 3d at 115. While acknowledging there is no requirement for a circuit court to order a mental health examination prior to an adjudicatory hearing, the Third District determined "such an examination is necessary in the case where *the respondent requests an exam* and the State's entire juvenile neglect petition rests *solely* upon the allegation that the respondent is mentally disabled or suffers from psychological problems." (Emphases added.) *C.S.*, 376 Ill. App. 3d at 119-20.

¶ 34 Such was not the case here. Respondent's counsel did not request a mental health examination, and the circuit court was under no duty to order one in counsel's stead. Further, the State's petition did not rest solely on claims respondent was mentally ill. Rather, the State's petition alleged actual incidents in which respondent behaved erratically around her child and her child internalized her mother's delusions. Although these claims are related to claims respondent was suffering from a mental illness, it does not equate to the situation in *C.S.*, in which the State

- 11 -

only alleged the respondent mother suffered from "psychological problems." *C.S.*, 376 Ill. App. 3d at 115. Accordingly, we cannot find the circuit court erred by failing to *sua sponte* order a mental health evaluation.

¶ 35                                         III. CONCLUSION

¶ 36            For the reasons stated, we affirm the circuit court's judgment.

¶ 37            Affirmed.